Arthur Edmund URESTI, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–00–01028–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Jan. 21, 2003.

Anthony Osso and Tony Aninao, Houston, for Appellant.

Alan Curry, Asst. Dist. Atty., Houston, for State.

Panel consists of Justices HEDGES, JENNINGS, and WILSON.*

## OPINION

TERRY JENNINGS, Justice.

After the denial of his motions to suppress evidence, appellant, Arthur Edmund Uresti, pleaded guilty to the misdemeanor offense of keeping a gambling place. The trial court found appellant guilty and, pursuant to an agreed recommendation by the State, assessed punishment at 30 days in jail. The trial court then, over appellant's objection, ordered appellant to pay $4,000 in restitution to the Houston Police Department as reimbursement for its expenses in investigating and prosecuting appellant. In 10 points of error, appellant asserts that the trial court erred in ordering him to pay restitution to the Houston Police Department and in overruling his motion and amended motion to suppress physical evidence, motion to suppress trap and trace evidence and pen register evidence, and motion to suppress call forwarding evidence.

We reverse and vacate in part and affirm in part.

### Factual and Procedural Background

At the hearing on appellant's motions to suppress evidence, the State stipulated that appellant was arrested for and charged with the instant offense based on evidence obtained pursuant to the execu-

* The Hon. Davie L. Wilson, retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

tion of a search warrant at appellant's residence. Appellant introduced into evidence, without objection, the search warrant, its underlying 24–page affidavit, and the State's applications for, and the court orders approving the use of, trap and trace, pen register, caller identification, and call forwarding equipment on appellant's two telephone lines.

The record indicates that, on February 22, 2000, the State filed an application for a court order to install and operate a trap and trace device [1] for two telephone numbers subscribed to appellant at his residence. The State asserted that the installation and utilization of the device was material to the ongoing investigation of an illegal bookmaking operation, allegedly run by appellant. The State further asserted that the use of the device would assist in identifying other participants and co-conspirators of the bookmaking operation by providing information concerning the subscribers of telephone services who placed calls to the two telephone numbers. The order obtained by the State provided for the operation of the device from February 25 through March 25, 2000.

On March 22, 2000, the State filed an identical application for a trap and trace device and received another order allowing the operation of the device from March 26 through April 25, 2000. Also on March 22, 2000, the State obtained a court order to determine the final destination of calls made to the two telephone numbers, i.e., to see if any incoming calls were forwarded to another telephone number.

On April 11, 2000, the State filed an application for a court order to install and use a pen register [2] and trap and trace device for one of the telephone numbers subscribed to appellant at his residence. This application specifically requested an order to install

> a mechanical or electronic device that attaches to the telephone line and is capable of recording an incoming electronic or other impulse that identifies the originating number of an instrument or device from which a wire or electronic communication was transmitted to the target telephone and that the trap and trace device *use a calling feature known as enhanced caller identification (or "Caller ID"),* if available.

(Emphasis added.) It further clarified as follows:

> While this application seeks a trap and trace device to capture and identify telephone numbers dialed to the target telephone and subscriber information about those numbers and, while Section 1(7), Article 18.21, Code of Criminal Procedure, which is the Texas law concerning the installation and use of a trap and trace device, specifically excludes "caller identification" from the definition of a trap and trace device, this Application *does not concern caller identification, (or "Caller ID"), as that term is used to describe the arms-length business transaction between any subscriber and telephone company* under Subchapter E, Chapter 55, Utilities Code. Although this application *does not involve the commercial transaction know as Caller ID, it*

---

1. A "trap and trace device" is a "device that records an *incoming* electronic or other impulse that identifies the originating number of an instrument or device from which a wire or electronic communication was transmitted." TEX.CODE CRIM. PROC. ANN. art. 18.21 § 1(7) (Vernon Supp.2003) (emphasis added).

2. A "pen register" is a "device that attaches to a telephone line and records or decodes electronic or other impulses *to identify numbers dialed or otherwise transmitted* on the telephone line." TEX.CODE CRIM. PROC. ANN. art. 18.20 § 1(14) (Vernon Supp.2003) (emphasis added).

*does involve using the Caller ID calling feature technology* in order to more effectively implement installation and use of the underlying trap and trace device. (Emphasis added.) The State asserted that information obtained from the pen register, trap and trace device, and caller identification feature was material to the ongoing investigation. The order obtained by the State authorized the installation and use of the requested "pen register, trap and trace device, and caller identification feature on the target telephone" for a period of 60 days.

Houston Police Officer G.C. Fencl, an officer assigned to the Vice Division/Organized Gambling Squad, prepared a 24–page, typed, single-spaced affidavit in support of the search warrant, stating his belief that appellant participated in, and committed the offenses of, gambling promotion, engaging in bookmaking, keeping a gambling place, communicating gambling information, and money laundering. The affidavit further alleged that appellant was in the unlawful possession of gambling paraphernalia. Officer Fencl explained that, although he had initially received information from an unidentified informant that appellant was running an illegal sports bookmaking operation, Fencl knew appellant from previous investigations of illegal bookmaking and was aware of appellant's previous arrests for gambling promotion and engaging in organized criminal activity. Fencl received information that appellant was using two telephone numbers for providing betting line information and for accepting wagers on the 1999–2000 college and professional basketball season games.

In the affidavit, Officer Fencl provided detailed information, based on his experience and observations, about the operations of bookmakers, their financial backers and bettors and how money is made, lost, and paid on wagers. Fencl also detailed his knowledge of "booking hours" and explained that term as the "period of time that is approximately one and a half to two hours prior to the beginning of the earliest scheduled sporting event and ending at a predetermined time that has been provided to bettors."

Officer Fencl noted that an analysis of the trap and trace results of one of appellant's telephone numbers showed that from February 25, 2000 through March 2, 2000, 138 calls out of 141 were placed to that number during "booking hours." A second analysis for this number from March 3, 2000 through March 9, 2000, revealed that 135 out of 136 calls were made during "booking hours." Several other subsequent analyses of trap and trace results on this number continued the pattern and indicated a similar high percentage of calls were received during "booking hours." Officer Fencl observed a "distinctive pattern" of telephone calls placed to appellant's telephone numbers "one right after another" during "booking hours." Moreover, Fencl obtained subscriber information associated with the telephone numbers received from the trap and trace, and was able to identify several subscribers known as gamblers and bookmakers.

Officer Fencl stated that, based on his experience and previous observations of bookmaking operations, bookmakers keep their own documents and gambling paraphernalia, i.e., line sheets, bet slips, recap sheets, money, canceled checks, financial records, and other gambling instruments. He noted that a bookmaker will maintain and keep these items and documents for long periods of time. Fencl also stated that bookmakers also keep gambling documentation on computers, computer disks, and tapes. He noted that he believed that appellant would have such gambling documentation and paraphernalia at his resi-

dence, which Fencl and other officers had placed under surveillance.

On April 19, 2000, the State obtained and executed the search warrant on appellant's residence and vehicle and found and seized, among other things, approximately $42,926 in cash.

Following a hearing, the trial court denied appellant's motion and amended motion to suppress physical evidence, motion to suppress trap and trace evidence and pen register evidence, and motion to suppress call forwarding evidence.

### "Caller Identification" and "Call Forwarding" Evidence

In points of error two, four, and five, appellant contends that the trial court erred in overruling his motions to suppress evidence because article 18.21 of the Texas Code of Criminal Procedure [3] prohibits the State from obtaining "caller identification" and "call forwarding" evidence and because there is no statutory basis for obtaining "call forwarding" evidence.

■ Appellant argues that article 18.21, which governs the installation and use of pen registers and trap and trace devices by law enforcement, expressly precludes the State from obtaining "caller identification" information. He further argues that the State is therefore also precluded from obtaining "call forwarding" information. Appellant contends the obtaining of such evidence "was totally illegal, unauthorized, and specifically excluded" under the provisions of article 18.21.

An authorized peace officer may request an attorney for the State to file an application for the installation and use of a pen register and/or trap and trace device "to obtain information material to the investigation of a criminal offense." *See* TEX.

CODE CRIM. PROC. ANN. art. 18.21, §§ 2(a), (b). Moreover, a district or criminal district attorney may, personally on his own motion, file such an application. *See id.* A judge of the judicial district in which the proposed installation will be made, on presentation of a sworn written application, may then order the installation and utilization of a pen register and/or trap and trace device. *See* TEX.CRIM. PROC.CODE ANN. art. 18.21, §§ 2(d), (e).

Article 18.21, section 1(7) provides that the term "trap and trace device" does not include a device or telecommunications network *used in providing:*

(A) a *caller identification service* authorized by the Public Utility Commission of Texas under Subchapter E, Chapter 55, Utilities Code;

(B) the *services* referenced in Section 55.102(b), Utilities Code; or

(C) a caller identification service provided by a commercial mobile radio service provider licensed by the Federal Communications Commission.

TEX.CRIM. PROC.CODE ANN. art. 18.21, §§ 1(7)(A), (B), (C) (emphasis added). The Utilities Code defines the caller identification service that may be provided by a telecommunications utility or provider and regulated by the Public Utility Commission of Texas:

"Caller identification service" means *a service that provides caller identification information* to a device that can display the information.

TEX. UTIL.CODE ANN. § 55.101(2) (Vernon 1998) (emphasis added).

As contemplated by article 18.21, section 1(7), the trap and trace device to be utilized may not, itself, be a device "used in providing" a "caller identification service" to a private subscriber. Here, the State

---

**3.** TEX.CODE CRIM. PROC. ANN. art. 18.21 (Vernon   Supp.2003).

did not request that the court order the installation and utilization of a device to be used in providing a caller identification service. Rather, the State specifically requested that the installed trap and trace device "use a calling feature known as enhanced caller identification (or "Caller ID"), if available."

In its application, the State distinguished article 18.21, section 1(7) and noted, "this Application does not concern caller identification (or "Caller ID"), as that term is used to describe the arms-length business transaction between any subscriber and telephone company under Subchapter E, Chapter 55, Utilities Code." The application clearly stated that, "Although this Application does not involve the commercial transaction known as Caller ID, it does involve using the Caller ID calling feature *technology* in order to more effectively implement installation and use of *the underlying trap and trace device*." (Emphasis added.)

Contrary to appellant's argument, article 18.21, section 1(7) does not preclude the use of caller identification technology to obtain caller identification information. The sole purpose of a trap and trace device is, in fact, to record "incoming" electronic or other impulses "to identify the originating number" of incoming telephone calls. *See* TEX.CRIM. PROC.CODE ANN. art. 18.21, § 1(7). Article 18.21, section 1(7) simply prohibits the utilization of a device "used in providing" a caller identification "service" to a private subscriber to obtain this information.

■ Moreover, article 18.21 does not preclude the State from obtaining "call forwarding" information. As noted above, the purpose of a trap and trace device is to identify incoming calls, not to determine their final destination. "Caller identification" and "call forwarding" perform two separate and distinct functions, and article 18.21 does not address or concern "call forwarding" in any way. Appellant's argument that article 18.21 logically precludes the State from obtaining "call forwarding" evidence is without merit.

■ Appellant further asserts that the State obtained "call forwarding" information in the "total absence of any type of statutory authorization to do so." The State, separate from its application to install and use a pen register and trap and trace device, applied for and received two court orders to determine "the final destination" of telephone calls made to appellant's two telephone numbers. In its applications for the court orders, the State asserted that "the telephone numbers and the instruments assigned thereto are being utilized and employed for the purpose of furthering criminal activity" and that "call forwarding" is being activated "in furtherance of said activity."

Contrary to appellant's assertion, a governmental entity may require a provider of an electronic communication service to disclose a record or other information pertaining to a subscriber to or customer of such service when the governmental entity obtains a court order for such a disclosure. 18 U.S.C. § 2703(c)(1)(B) (1993 & Supp. 2003). A governmental entity may obtain such an order only if it offers specific and articulable facts showing there are reasonable grounds to believe that the contents of the record or other information is relevant to an ongoing criminal investigation. 18 U.S.C. § 2703(d) (1993 & Supp.2003). Thus, appellant's argument that the State obtained "call forwarding" information in the absence of any statutory authority is without merit.

We overrule appellant's second, fourth, and fifth points of error.

## Search

■ In point of error three, appellant contends that the trial court erred in overruling his motion to suppress trap and trace evidence and pen register evidence because the gathering of such evidence constituted a search, unsupported by probable cause, in violation of his right to be free from unreasonable searches and seizures,[4] as secured by the Texas Constitution.[5]

The statutory mechanism allowing the State to obtain pen register and trap and trace information does not require a showing of probable cause. Rather, an application for the use of a pen register or a trap and trace device must simply "state that the installation and utilization of the pen register or trap and trace device *will be material to the investigation of a criminal offense.*" TEX.CODE CRIM. PROC. ANN. art. 18.21, § 2(c) (emphasis added).

Article I, § 9 of the Texas Constitution provides as follows:

> The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation.

TEX. CONST. art. I, § 9. Similarly, the Fourth Amendment recognizes the inviolable "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV.

Even if the language of Article I, § 9 were identical to that of the Fourth Amendment, the Texas Court of Criminal Appeals has noted that Texas courts "must construe that language according to our own lights." *Richardson v. State,* 865 S.W.2d 944, 948 (Tex.Crim.App.1993). Nevertheless, the Court also acknowledged that the two provisions are "in all material aspects, the same," and noted that Texas courts should not hesitate "to examine Fourth Amendment analogues, or the construction other states have given their own constitutional provisions regarding search and seizure, for guidance." *Id.*

■ The substantive question of what is a "search" has been effectively merged with what had been a procedural question of "standing" to challenge a search. *Id.* The purpose of both the Fourth Amendment and Article I, § 9 is "to safeguard an individual's 'legitimate expectation of privacy' from unreasonable governmental intrusions." *Id.* The test for determining the existence of a "legitimate expectation of privacy" for a particular individual raises two questions. The first is whether the individual, by his conduct, has "exhibited an actual (subjective) expectation of privacy," i.e., whether the individual has shown that he seeks to preserve something as private. *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979); *Richardson,* 865 S.W.2d at 948. The second is whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable,'" i.e., whether the individual's expectation, viewed objectively, is "justifiable" under the circumstances. *Smith,* 442 U.S.

---

4. Under this point of error, appellant also argues that, by recording the existence, time, and duration of incoming telephone calls, capabilities not within the statutory definition of a trap and trace device, the State acted beyond its authority. However, a review of the record reveals that appellant did not present this complaint to the trial court, and he has therefore failed to preserve the issue for our review. TEX.R.APP. P. 33.1.

5. TEX. CONST. art. I, § 9.

at 740, 99 S.Ct. at 2580; *Richardson,* 865 S.W.2d at 948.

### Pen Register

In regard to whether the use of pen register constitutes a search, the Court of Criminal Appeals has noted that, in regard to both the Fourth Amendment and Article I, § 9, the answer depends upon whether an individual demonstrates a " 'legitimate expectation of privacy' in the numbers he dialed on the telephone." *Richardson,* 865 S.W.2d at 949. As clarified by the Court:

> In other words, in determining the legitimacy of appellant's expectation of privacy, the appropriate inquiry is whether appellant expected that the numbers he dialed on the telephone would be free from governmental intrusion, and, if he did, is this expectation one that society is prepared to recognize as reasonable.

*Id.*

The United States Supreme Court, in *Smith,* unequivocally held that the installation and use of a pen register is not a search under the Fourth Amendment. *Smith,* 442 U.S. at 745–46, 99 S.Ct. at 2583. In regard to whether a defendant could harbor a subjective expectation of privacy, the Supreme Court expressed its doubt that people in general entertain any actual expectation of privacy in the telephone numbers they dial, and reasoned:

> All telephone users realize that they must "convey" phone numbers to the telephone company, since it is through telephone company switching equipment that their calls are completed. All subscribers realize, moreover, that the phone company has facilities for making permanent records of the numbers they dial, for they see a list of their long-distance (toll) calls on their monthly bills. In fact, pen registers and similar devices are routinely used by telephone companies "for the purposes of checking billing operations, detecting fraud and preventing violations of law." ... Electronic equipment is used not only to keep billing records of toll calls, but also "to keep a record of all calls dialed from a telephone which is subject to a special rate structure." ... Pen registers are regularly employed "to determine whether a home phone is being used to conduct a business, to check for a defective dial, or to check for overbilling." ... Although most people may be oblivious to a pen register's esoteric functions, they presumably have some awareness of one common use: to aid in the identification of persons making annoying or obscene calls. ... Most phone books tell subscribers, on a page entitled "Consumer Information," that the company "can frequently help in identifying to the authorities the origin of unwelcome and troublesome calls." ... Telephone users, in sum, typically know that they must convey numerical information to the phone company; that the phone company has facilities for recording this information; and that the phone company does in fact record this information for a variety of legitimate business purposes. Although subjective expectations cannot be scientifically gauged, it is too much to believe that telephone subscribers, under these circumstances, harbor any general expectation that the numbers they dial will remain secret.

*Id.,* 442 U.S. at 742–43, 99 S.Ct. at 2581 (citations omitted). In response to Smith's argument that he demonstrated that he had an expectation of privacy in the telephone numbers he dialed because he used the telephone in his house to the exclusion of all others, the Supreme Court stated that the site of the call was immaterial for purposes its analysis:

Although petitioner's conduct may have been calculated to keep the contents of his conversation private, his conduct was not and could not have been calculated to preserve the privacy of the number he dialed. Regardless of his location, petitioner had to convey that number to the telephone company in precisely the same way if he wished to complete his call. The fact that he dialed the number on his home phone rather than on some other phone could make no conceivable difference, nor could any subscriber rationally think that it would.

*Id.*, 442 U.S. at 743, 99 S.Ct. at 2582.

Moreover, the Supreme Court noted that, even if a defendant harbored some subjective expectation that the telephone numbers he dialed would remain private, this expectation is not "one that society is prepared to recognize as 'reasonable'" because "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Id.*, 442 U.S. at 743–44, 99 S.Ct. at 2582. The Supreme Court noted that, when Smith used his telephone, he voluntarily conveyed numerical information to the telephone company and "exposed" that information to its equipment in the ordinary course of business and, thus, he assumed the risk that the company would reveal to police the numbers he dialed. *Id.*, 442 U.S. at 744, 99 S.Ct. at 2582.

The Supreme Court concluded that Smith, in all probability, entertained no actual expectation of privacy in the telephone numbers he dialed, and that, even if he did, his expectation was not "legitimate"; consequently, the installation and use of a pen register was not a "search," and no warrant was required. *Id.*, 442 U.S. at 745–46, 99 S.Ct. at 2583.

In *Richardson*, the Texas Court of Criminal Appeals, expressly critical of the Supreme Court's reasoning in *Smith*, held

that "the use of a pen register *may well* constitute a 'search' under Article I, § 9 of the Texas Constitution." 865 S.W.2d at 953 (emphasis added). The Amarillo Court of Appeals, following the reasoning of *Smith*, had previously held that the use of a pen register was not a search under Article I, § 9. *See Richardson v. State*, 831 S.W.2d 78, 79 (Tex.App.-Amarillo 1992), *vacated and remanded*, 865 S.W.2d 944, 954 (Tex.Crim.App.1993). In remanding the case to the court of appeals, the Court of Criminal Appeals noted as follows:

> We hold only that the court of appeals erred to dispose of appellant's many points of error on appeal on the basis of a broad holding that the use of a pen register never, under any circumstances, constitutes a "search" under Article I, § 9.

*Richardson*, 865 S.W.2d at 953–54 n. 9. On remand, the *Richardson* court of appeals held that Richardson did not have standing to complain about an actual expectation of privacy because he disclosed the fact that he was calling the telephone numbers in question to other third parties. *Richardson v. State*, 902 S.W.2d 689, 693–94 (Tex. App.-Amarillo 1995, no pet.).

Following the holding in *Richardson* that a pen register may well constitute a search, an accused still has the burden of proving facts establishing a legitimate expectation of privacy. *McArthur v. State*, 1 S.W.3d 323, 329 (Tex.App.-Fort Worth 1999, no pet.) (citing *Calloway v. State*, 743 S.W.2d 645, 650 (Tex.Crim.App.1988)). The determination of a person's actual expectation of privacy is to be measured by the person's conduct. *Richardson*, 865 S.W.2d at 948. Thus, appellant had the burden of establishing (1) that he exhibited by his conduct "an actual (subjective) expectation of privacy," and (2) that his subjective expectation was "justifiable," i.e.,

"one that society is prepared to recognize as reasonable." *Id.* at 948–49.

Here, appellant, under questioning from defense counsel, testified as follows that the telephone numbers in question were his "personal telephone numbers":

[Defense Counsel]: And you pay the bill for those numbers?

[Appellant]: Yes, I do.

[Defense Counsel]: To Southwestern Bell?

[Appellant]: Yes, I do.

[Defense Counsel]: As to—you have a call forwarding feature on that telephone?

[Appellant]: Yes, I do. ·

[Defense Counsel]: And as to the phone calls you make and phone calls that you receive, do you feel as though you have a privacy interest in those telephone numbers?

[Appellant]: Yes, I do.

[Defense Counsel]: And where you forward them to?

[Appellant]: Yes, I do.

[Defense Counsel]: No further questions.

Although appellant stated generally that he felt as though he had a "privacy interest" in "those telephone numbers," he did not articulate why he felt that way. More importantly, appellant failed to explain what conduct he exhibited to demonstrate an actual expectation of privacy in the numbers he dialed on his telephones. In fact, the only "conduct" that appellant testified to was that he subscribed to a call

forwarding service from his telephone company.

Appellant, in his brief, argues that "in this day and age of increasingly sophisticated telecommunications technology, the availability of such items as 'anonymous calling' and 'anonymous call rejection' and 'call blocking' or 'caller blocking,' reflect a recognition that the private communications users exchange, and more importantly for purposes of the case, even their identity, will remain exactly so—private and secure from prying eyes."

On the contrary, these new technologies demonstrate, in fact, that individuals actually have the burden of adding services like an "anonymous calling" feature if they want a record of who they call to remain private and, thus, retain an expectation of privacy. Given the prevalence of services like caller identification, an individual's expectation that the telephone numbers he dials on his telephone will not be published to the rest of the world is no longer objectively reasonable.[6]

We hold that appellant failed to meet his burden of proving facts establishing that he exhibited by his conduct "an actual (subjective) expectation of privacy," in the numbers he dialed on his telephones. Because appellant failed to meet his initial burden, it logically follows that he failed to meet his additional burden of showing that any subjective expectation of privacy harbored by him in this case was "justifiable," i.e., "one that society is prepared to recognize as reasonable." Thus, we hold that the State's use of a pen register in this

---

**6.** We note that, on remand, the Amarillo Court of Appeals recognized that the "recent advent of caller identification services, where the telephone company conveys information about the origin of each call to the call's recipient, brings into question the continued vitality of the common understanding referred to in the court's opinion." *Richardson,* 902 S.W.2d at 693 n. 4 (referring to Court of Criminal Appeals' reasoning that common understanding exists that telephone numbers we call remain our own affair, and will go no further).

case was not a search under Article I, § 9 of the Texas Constitution.

### Trap and Trace Device

█ In regard to whether the use of a trap and trace device constitutes a search under Article I, § 9, we note that the Fort Worth Court of Appeals has held, "for the reasons enunciated in *Richardson,* use of a 'trap and trace' device *may* constitute a search under article I, section 9." *McArthur,* 1 S.W.3d at 329 n. 3. We respectfully disagree.

As noted above, a pen register actually "records or decodes electronic or other impulses *to identify numbers dialed or otherwise transmitted* on the telephone line," i.e., the numbers that one dials on one's own telephone. *See* TEX.CODE CRIM. PROC. ANN. art. 18.20 § 1(14) (emphasis added). On the other hand, a trap and trace device actually "records an *incoming* electronic or other impulse that identifies the originating number of an instrument or device from which a wire or electronic communication was transmitted," i.e., the numbers assigned to those calling one's telephone. *See* TEX.CODE CRIM. PROC. ANN. art. 18.21 § 1(7) (emphasis added). The distinction is significant. It does not logically follow that because one may have a legitimate expectation of privacy in the numbers that one dials on one's telephone, that one would have such an expectation of privacy in the telephone numbers belonging to other individuals placing calls to one's telephone.

We hold that the use of a trap and trace device does not constitute a search under Article I, § 9 of the Texas Constitution. Nevertheless, appellant, in this case, failed to meet his burden of proving facts establishing that he exhibited by his conduct "an actual (subjective) expectation of privacy," in the telephone numbers belonging to other individuals placing calls to his telephone numbers. Moreover, because appellant failed to meet his initial burden, he further failed to show that any subjective expectation of privacy harbored by him in this case was "justifiable." Thus, even assuming that the use of a trap and trace device might, under certain circumstances, be considered a search under Article I, § 9, we further hold that the State's use of a trap and trace device in this case was not a search.

We overrule point of error three.

### Probable Cause and Conclusory Affidavit

In points of error seven and eight, appellant contends that the trial court erred in overruling his motion and amended motion to suppress physical evidence because the affidavit in support of the search warrant, in violation of Article I, § 9, did not establish probable cause to support the issuance of the search warrant and did not establish probable cause that appellant was engaging in any gambling activity. In point of error six, appellant contends that the trial court erred in overruling his motion and amended motion to suppress physical evidence because the search warrant affidavit, in violation of Article I, § 9, was "purely conclusory in nature."

█ The task of a magistrate in issuing a search warrant is to make a practical, common-sense decision whether, given all the circumstances set forth in the warrant's supporting affidavit, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). The duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed to sup-

port the issuance of the warrant. *Id.* The *Gates* "totality of the circumstances" test applies in Texas probable cause determinations made under Article I, § 9 and article 18.01 of the Code of Criminal Procedure.[7] *Eisenhauer v. State*, 754 S.W.2d 159, 164 (Tex.Crim.App.), *cert. denied,* 488 U.S. 848, 109 S.Ct. 127, 102 L.Ed.2d 101 (1988), *overruled in part, Heitman v. State,* 815 S.W.2d 681, 684–85, 690 (Tex.Crim.App. 1991); *see Amores v. State,* 816 S.W.2d 407 (Tex.Crim.App.1991) (applying Gates/*Eisenhauer* "totality of the circumstances" test, post-*Heitman,* to determine probable cause in warrantless search and seizure context).

■■ In conducting this analysis, a reviewing court should not conduct a de novo review to determine the sufficiency of an affidavit for probable cause. *Gates,* 462 U.S. at 236, 103 S.Ct. at 2331. The magistrate's determination of probable cause should be paid great deference by reviewing courts. *Id.* The test for determination of probable cause is whether the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing. *Id.*

■■■ Probable cause to support the issuance of a search warrant exists where the facts submitted to the magistrate are sufficient to justify a conclusion that the object of the search is probably on the premises to be searched at the time the warrant is issued. *Cassias v. State,* 719 S.W.2d 585, 587 (Tex.Crim.App.1986). A search warrant affidavit must be read in a common-sense and realistic manner, and reasonable inferences may be drawn from the facts and circumstances contained within its four corners. *Id.* at 587–88.

■■ Appellant contends that "the affidavit is premised on mere conclusory statements of the affiant as it relates to

defendant.... It is evident throughout the affidavit that there is no basis for the conclusory statements made about the defendant ... his residence ... or his automobile." Appellant argues that the "entire gist" of the search warrant affidavit "are [sic] contentions that, based on pen registers and trap and trace devices installed on Appellant's two telephones, Appellant received a certain number of telephone calls during 'booking hours.' " He claims that the reviewing magistrate had no details of any "booking hours." Appellant also points out that no witness saw him engage in any gambling activity.

Here, the search warrant was supported by a detailed, 24–page, typed, single-spaced affidavit. In the affidavit, Houston Police Officer G.C. Fencl, the affiant, stated that he was assigned to the Vice Division/Organized Gambling Squad and that he had over seven years of experience in investigating bookmakers and bookmaking operations. In the affidavit, Officer Fencl provided detailed information, based on his experience and observations, about the operations of bookmakers, their financial backers and bettors and how money is made, lost, and paid on wagers. Fencl also detailed his knowledge of "booking hours," and he explained that term as the "period of time that is approximately one and a half to two hours prior to the beginning of the earliest scheduled sporting event and ending at a predetermined time that has been provided to bettors."

Although Officer Fencl initially received information from an unidentified informant that appellant was running an illegal sports bookmaking operation, Fencl knew appellant from previous investigations of illegal bookmaking and was aware of appellant's previous arrests for gambling promotion and engaging in organized crim-

---

7. Tex Code Crim. Proc. Ann. art. 18.01 (Vernon    Supp.2003).

inal activity. Fencl received information that appellant was using two telephone numbers for providing betting line information and for accepting wagers on the 1999–2000 college and professional basketball season games.

Officer Fencl then, with grand jury subpoenas, obtained information from Southwestern Bell Telephone Company that appellant was, in fact, the subscriber to those telephone numbers. Fencl also obtained court orders for the use of a trap and trace device on these telephone numbers from February 25 through March 25, 2000, and from March 26, 2000 through April 25, 2000, to obtain information on the telephone numbers of callers to appellant's telephones. The analysis of the trap and trace results of one of appellant's telephone numbers showed that from February 25, 2000 through March 2, 2000, 138 calls out of 141 were placed during "booking hours." A second analysis for this number from March 3, 2000 through March 9, 2000, revealed that 135 out of 136 calls were made during "booking hours." Several other subsequent analyses of trap and trace results on this number continued the pattern and indicated a similar high percentage of calls were received during "booking hours." Officer Fencl confirmed that these calls were made during the 1999–2000 college and professional basketball season.

Officer Fencl further stated that information concerning the final destination of calls made to appellant's phone numbers, or call forwarding information, during "booking hours" indicated that the calls were not forwarded to another telephone number. Fencl noted that appellant's telephone numbers were not listed as any type of commercial business and that the exceptionally large number of telephone calls made to appellant's personal telephone numbers was consistent with bookmaking

operations. Fencl noticed a "distinctive pattern" of telephone calls placed to appellant's telephone numbers "one right after another" during "booking hours." Moreover, Fencl obtained subscriber information associated with the telephone numbers received from the trap and trace, and was able to identify several subscribers known as gamblers and bookmakers.

Officer Fencl stated that, based on his experience and previous observations of bookmaking operations, bookmakers keep their own documents and gambling paraphernalia, i.e., line sheets, bet slips, recap sheets, money, canceled checks, financial records, and other gambling instruments. He noted that a bookmaker will maintain and keep these items and documents for long periods of time. Fencl also stated that bookmakers also keep gambling documentation on computers, computer disks, and tapes. He noted that he, thus, believed that appellant would have gambling documentation and paraphernalia at his residence, which Fencl and other officers had placed under surveillance.

Although the above is only a brief review of Officer Fencl's affidavit, and by no means reflects all the information contained therein, it is apparent that appellant's argument that the "entire gist" of the search warrant affidavit consists of contentions that appellant received a certain number of telephone calls during "booking hours" is without merit. Officer Fencl's detailed, 24–page, single-spaced affidavit was not merely conclusory, but provided the magistrate with a substantial basis for concluding that a search of appellant's residence would uncover evidence of gambling promotion, bookmaking, and keeping a gambling place. Moreover, appellant did not alert the trial court and has not directed this Court to any specific conclusory statements contained in the affidavit.

■ Appellant also argues that the trial court erred in denying his motion and amended motion to suppress physical evidence because there was no probable cause to believe that appellant was present in his condominium at the time when telephone calls were received during "booking hours." However, in regard to the search warrant affidavit, it was not necessary for the affiant to articulate facts showing that appellant was present at the condominium during "booking hours," essentially proving that he was participating directly in criminal activity.

■ The pertinent question is whether the facts submitted to the magistrate are sufficient to justify a conclusion that the items, which are the object of the search, are probably on the premises to be searched at the time the warrant issues. *Massey v. State*, 933 S.W.2d 141, 149 (Tex. Crim.App.1996). As the State was only required to demonstrate a probability that evidence of gambling promotion, bookmaking, or keeping a gambling place would be found in appellant's condominium, it is irrelevant whether appellant was actually present at the condominium during "booking hours."

We hold that, under the totality of the circumstances, giving due weight to the preference accorded to the magistrate's finding, the search warrant affidavit provided the magistrate with a substantial basis for concluding that evidence of gambling promotion, bookmaking, and keeping a gambling place would probably be found in appellant's residence upon execution of the search warrant.

We overrule points of error six, seven, and eight.

### Stale Information

■ In point of error nine, appellant contends that the trial court erred in overruling his motion and amended motion to suppress evidence because the information contained in the search warrant affidavit was "stale" and over 30–days old, in violation of Article I, § 9, by the time the search warrant was executed.

■ To justify a magistrate's finding that an affidavit is sufficient to establish probable cause to issue a search warrant, the facts set out in the affidavit must not have become stale by the time the magistrate issues the search warrant. *Hafford v. State*, 989 S.W.2d 439, 440 (Tex. App.-Houston [1st Dist.] 1999, pet. ref'd). The proper method to determine whether the facts supporting a search warrant have become stale is to examine, in light of the type of criminal activity involved, the time elapsing between the occurrence of the events set out in the affidavit and the time the search warrant was issued. *Id.*

Appellant contends that the search warrant affidavit was based on pen register information and trap and trace information that was gathered more than 30 days prior to the execution of the warrant. The search warrant was issued and executed on April 19, 2000. On its face, the affidavit refers to pen register information and trap and trace information regarding telephone calls to and from appellant's two telephone numbers made between February 25, 2000 and April 18, 2000. Thus, there was no time lapse between the occurrence of the events contained in the affidavit and the time the warrant was issued. Appellant's argument is without merit.

We overrule point of error nine.

### Description of Seized Items

■ In point of error 10, appellant contends that the trial court erred in overruling his motion and amended motion to suppress evidence because the search warrant, in violation of Article I, § 9, failed to " 'particularly describe' telephones, tape

recorders and tapes" as items to be seized from appellant's condominium. Appellant argues that the police officers executing the warrant should not have seized two "tape recordings" from his condominium because the tape recordings were not contraband per se.

The Texas Constitution provides that "no warrant to search any place, or to seize any person or thing, shall issue without describing them as *near as may be*." TEX. CONST. art. I, § 9 (emphasis added). The items to be seized must be described with sufficient particularity such that the executing officer is left with no discretion to decide what may be seized. *Winkfield v. State*, 792 S.W.2d 727, 731 (Tex.App.-Corpus Christi 1990, pet. ref'd). However, to require police to set forth information they could not know, under the guise of particularity, would thwart reasonable police activity. *Id.* at 732.

The record does not contain the actual "tape recordings" or the search warrant return. Moreover, appellant did not present any evidence to the trial court regarding the two "tape recordings." Thus, the record does not indicate precisely what type of "tape recordings" are at issue.

The search warrant commanded the officers to search for and seize several items, consisting mainly of gambling paraphernalia and various types of records of gambling information. Although "tape recordings" were not specifically listed in the search warrant, the search warrant specifically commanded the officers to search for and seize "instruments and instrumentality's [sic] utilized in the offense of communicating gambling information and computer and computer associated devices, including but not limited to, magnetic tapes."

■ A search warrant may be sufficient with only a generic description of items to be seized if a more specific description of the items is unavailable. *Id.* Here, appellant has not demonstrated that the search warrant did not, in fact, adequately describe the items to be seized, i.e., "as near as may be."

We overrule point of error 10.

### Restitution

■ In point of error one, appellant contends that the trial court erred in ordering him to pay $4,000 in restitution to the Houston Police Department as reimbursement for its cost in the investigation and prosecution of appellant.[8]

After the denial of his motions to suppress evidence, appellant pleaded guilty to the Class A misdemeanor offense of keeping a gambling place. The trial court found appellant guilty and, pursuant to an agreed recommendation by the State, assessed punishment at 30 days in jail. However, the trial court then, upon the motion of the State and over appellant's objection, ordered appellant to pay $4,000 in restitution to the Houston Police Department as reimbursement for its expenses in investigating and prosecuting appellant.

We review challenges to restitution orders under an abuse of discretion standard. *Cartwright v. State*, 605 S.W.2d 287, 288–89 (Tex.Crim.App.1980). The punishment for a Class A misdemeanor "shall be" a fine not to exceed $4,000, confinement in jail for a term not to exceed one year, or both such fine and confinement. TEX. PEN. CODE ANN. § 12.21 (Vernon 1994). In addition to any fine authorized by law, the

---

8. The State contends that the trial court did not grant appellant permission to appeal this issue. However, the notice of appeal, signed by the trial court, expressly states that appellant had permission to appeal this issue.

court that sentences a defendant convicted of an offense may order the defendant to make restitution to any "victim of the offense." Tex.Code Crim. Proc. Ann. art. 42.037(a) (Vernon Supp.2003).

The State argues, generally, that society would be served by the appellant reimbursing the Houston Police Department for its expenses in concluding the "inordinately complex and difficult investigation of the appellant's offense." Without citing any authority, the State concludes that it was reasonable for the trial court to find that the Houston Police Department was a "victim" under article 42.037.

Although article 42.037 does not define the term "victim," the Court of Criminal Appeals has noted that, "the focus of restitution orders are limited to individuals alleged and proven to be the victims of the charged offense." *Cabla v. State*, 6 S.W.3d 543, 546 (Tex.Crim.App.1999). Moreover, restitution, as contemplated by article 42.037, may be ordered if the offense results in damage to, or loss or destruction of, property of a victim, bodily injury to a victim, or the death of a victim. Tex.Code Crim. Proc. Ann. art. 42.037(b) (Vernon Supp.2003).

Here, the expenses incurred by the Houston Police Department in its investigation of appellant were not sustained as the result of being the victim of a crime. The Houston Police Department was not the direct recipient of an injury caused by appellant's crime. Thus, we hold the trial court abused its discretion in ordering appellant to pay $4,000 restitution to the Houston Police Department.

We sustain point of error one.

## Conclusion

We reverse and vacate the portion of the trial court's judgment awarding $4,000 restitution to the Houston Police Department, and we affirm the remainder of the judgment.