**Opinion issued July 25, 2014.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-13-00140-CR

————————————

**JAMES AGBEZE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 180th District Court**
**Harris County, Texas**
**Trial Court Case No. 1288928**

---

## MEMORANDUM OPINION

James Agbeze, a licensed government contractor, was indicted for submitting a series of fraudulent Medicaid reimbursement claims. The jury convicted Agbeze of theft of property by a government contractor with an

aggregated value of $1,500 or more, but less than $20,000,[1] assessed punishment at seven years' community supervision, and imposed a $10,000 fine. The trial court ordered Agbeze to spend 90 days in jail as a condition of community supervision and to pay $18,169.45 in restitution. On appeal, Agbeze contends that (1) there was insufficient evidence to prove that he intentionally or knowingly committed theft or that individual over-charges were part of a larger criminal scheme to allow the theft amounts to be aggregated and tried as one offense and that (2) the trial court abused its discretion in ordering him to pay $18,169.45 in restitution. We affirm.

## Background

In 2005, Agbeze began doing business as Browne Medical Supply and became a licensed Medicaid contractor providing durable medical equipment to Medicaid beneficiaries. Agbeze would purchase and deliver certain medical supplies, including incontinence products, and then submit a reimbursement claim to the Health and Human Services Commission. HHSC would then reimburse him for the products that he had provided to his clients.

In 2007, a state Medicaid investigator conducting an oversight review of Agbeze's records discovered that Agbeze was routinely filing reimbursement

---

[1] *See* TEX. PENAL CODE ANN. § 31.03(a), (e)(4)(A), (f)(4) (West 2012) (listing penalties for theft when actor is Medicare provider with contractual relationship with federal government); *see id.* § 31.09 (West 2012) (aggregating amounts involved in theft when amounts are obtained in one scheme or continuing course of conduct and using aggregate amount to determine grade of theft).

2

claims for the monthly maximum number of incontinence products allowed under Medicaid restrictions. According to HHSC's preliminary review of Agbeze's claims, Agbeze was "consistently billing" his clients for 300 extra-large adult diapers and other supplies including hygienic wipes and underpads.

Based on these preliminary findings, Agbeze became subject to a formal Medicaid investigation, which revealed that Agbeze had submitted multiple reimbursement claims for incontinence supplies without actually delivering the products to clients. Based on this information, Jesse Mack, a member of the state Medicaid Fraud Control Unit, initiated a criminal investigation into Agbeze's claims-filing practices. Relying on evidence that included unsigned and forged delivery slips, outdated client authorization forms, and incomplete files documenting client orders and authorizations, the investigators concluded that Agbeze had submitted multiple fraudulent reimbursement claims over the course of five years. The Fraud Control Unit determined that Agbeze was reimbursed an estimated $77,000 for fraudulent claims for incontinence supplies between 2005 and 2007 and an additional $55,000 between 2008 and 2010.

Agbeze was indicted for first-degree felony theft of property by a government contractor. At trial, the jury heard testimony from several HHSC investigators, including Consuelo Chavez, who testified that HHSC investigators had discovered Agbeze's fraudulent claims-filing patterns and that, despite

HHSC's request, Agbeze failed to produce complete files related to the disputed reimbursement claims.

HHSC Senior Policy Advisor, Sharon Thompson, also testified regarding Agbeze's claims records and discussed the application process and rules governing Medicaid contractors. Thompson testified that Agbeze's billing records were unusual because the maximum product limits were established based on a "worst case scenario" and only a small percentage of beneficiaries actually required the maximum number. Thompson also explained that a provider "trying to maximize their billing, whether they provided the service or not . . . [would] consistently [bill] for extra large adult [products]."

In his original application for licensure as a Medicaid contractor, Agbeze affirmed that he understood the Medicaid provider duties and responsibilities, including the duty to refund any overpayments, duplicate payments, or erroneous payments as soon as an error was discovered and to verify and track claims that he submitted. The State Medicaid provider manual, which accompanied Agbeze's application, limited the number of certain products for which he could submit reimbursement claims without prior Medicaid authorization. The manual also directed Agbeze to retain all documentation of submitted claims and patient information for five to ten years to facilitate investigation of potential fraud and ensure accurate provider reimbursement. The jury heard testimony from Agbeze's

4

clients who did not receive the total number of incontinence supplies for which Agbeze had sought reimbursement. The State also offered evidence of incomplete, unsigned and forged delivery receipts, deficient physician authorization forms, and noncompliance with the state Medicaid contractor manual.

Based on this evidence, the jury convicted Agbeze of the third-degree felony offense of aggregated theft and assessed punishment at seven years' community supervision and imposed a $10,000 fine. Additionally, the trial court ordered Agbeze to pay restitution of $18,169.45 to reflect the amount of fraudulently submitted claims.

Agbeze timely appealed.

## Sufficiency of the Evidence

In his first issue, Agbeze contends that the evidence was insufficient to prove that he had intentionally or knowingly committed aggregated theft. Specifically, Agbeze contends that the State failed to prove that (1) he intentionally appropriated property without the effective consent of the owner or that (2) his actions were part of one scheme or a continuous course of conduct such that the amounts of theft could be aggregated.

### A. Standard of review

We review challenges to the sufficiency of the evidence under the standard enunciated in *Jackson v. Virginia,* 443 U.S. 307, 318–20, 99 S. Ct. 2781, 2788–89

5

(1979). *See Ervin v. State,* 331 S.W.3d 49, 52–56 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (citing *Brooks v. State,* 323 S.W.3d 893, 894–913 (Tex. Crim. App. 2010)). Under the *Jackson* standard, evidence is insufficient to support a conviction if, considering all the record evidence in the light most favorable to the verdict, no rational factfinder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson,* 443 U.S. at 317–19, 99 S. Ct. at 2788–89; *Laster v. State,* 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). We consider both direct and circumstantial evidence and all reasonable inferences that may be drawn from the evidence in making our determination. *Clayton v. State,* 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

Evidence is insufficient under four circumstances: (1) the record contains no evidence probative of an element of the offense; (2) the record contains a mere "modicum" of evidence probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt; or (4) the acts alleged do not constitute the criminal offense charged. *See Jackson,* 443 U.S. at 314, 318 & n.11, 320, 99 S. Ct. at 2786, 2789 & n.11; *Laster,* 275 S.W.3d at 518; *Williams v. State,* 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

The *Jackson* standard defers to the factfinder to resolve any conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from "basic facts to ultimate facts." *Jackson,* 443 U.S. at 318–19, 99 S. Ct. at 2788–89;

6

*Clayton,* 235 S.W.3d at 778. Circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 14–15 (Tex. Crim. App. 2007); *Cantu v. State*, 395 S.W.3d 202, 207 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). And the State need not disprove all reasonable alternative hypotheses that are inconsistent with the defendant's guilt. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012); *Cantu*, 395 S.W.3d at 207. An appellate court presumes the factfinder resolved any conflicts in the evidence in favor of the verdict and defers to that resolution, provided that the resolution is rational. *See Jackson,* 443 U.S. at 326, 99 S. Ct. at 2793. If an appellate court finds the evidence insufficient under this standard, it must reverse the judgment and enter an order of acquittal. *See Tibbs v. Florida,* 457 U.S. 31, 41, 102 S. Ct. 2211, 2218 (1982).

**B.    Evidence supporting the conclusion that Agbeze intentionally or knowingly committed theft**

Agbeze first contends that the evidence was insufficient to prove that he "intentionally and knowingly" committed theft while acting as a government contractor.

A person commits theft if he unlawfully appropriates property with the intent to deprive the owner of that property without the owner's consent. TEX. PENAL CODE ANN. § 31.03(a), (b)(1) (West 2012). When, as is the case here, the definition of an offense does not prescribe a culpable mental state, a specific mental state must be alleged. *Id.* § 6.02 (West 2012); *Harris v. State*, 364 S.W.3d

7

328, 335 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (citing TEX. PENAL CODE ANN. § 6.02(b)). The indictment alleged that Agbeze had intentionally or knowingly committed first-degree theft of an aggregated amount of more than $100,000 and less than $200,000. *See* TEX. PENAL CODE ANN. § 31.03(a), (e)(6)(A), (f)(4) (West 2012) (listing penalties for theft when actor is Medicare provider with contractual relationship with federal government; noting that theft of more than $100,000 and less than $200,000 is first-degree felony if defendant is federal Medicare contractor); *see* TEX. PENAL CODE ANN. § 31.09 (West 2012) (aggregating amounts involved in theft when amounts are obtained in one scheme or continuing course of conduct and using aggregated amount to determine grade of theft). Accordingly, the State had the burden of proving that Agbeze acted with either such state of mind.

A person acts intentionally if he acts with the conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a) (West 2012). A person acts knowingly when he is aware of the nature of his conduct and acts knowing his conduct is reasonably certain to cause the result. *Id.* § 6.03(b) (West 2012). Intent can be inferred based on a defendant's words, acts, and conduct and "is a matter of fact, to be determined from all of the circumstances." *Smith v. State*, 965 S.W.2d 509, 518 (Tex. Crim. App. 1998).

There was sufficient evidence from which a reasonable factfinder could conclude that Agbeze acted intentionally or knowingly. First, there was evidence that Agbeze was aware of his responsibilities and obligations as a Medicaid contractor and that he knew of the consequences of failing to adhere to those responsibilities. The jury heard testimony from Thompson regarding the requirements and documentation required for an individual, like Agbeze, to participate as a Medicaid contractor. By signing the Medicaid provider application, Agbeze affirmed that he understood the Medicaid program procedures and policies, that he was bound by the rules and terms of his provider status, and that he would be subject to administrative and criminal punishment for submitting false or invalid claims. Furthermore, Agbeze acknowledged that he was prohibited from submitting reimbursement claims for services that he did not provide or for products that he did not deliver to beneficiaries.[2] Agbeze also agreed that he was obligated to refund any overpayments, duplicate payments, or erroneous payments as soon as an error was discovered and that he had a duty to verify and track claims that he submitted. Thompson also explained that the manual directed Agbeze to retain all documentation of submitted claims and patient information for five to ten

---

[2]     By signing the agreement, Agbeze specifically acknowledged that "[a]ll claims or encounters submitted by Provider must be for services actually rendered by provider."

9

years to facilitate investigation of potential fraud and ensure accurate provider reimbursement, which Agbeze failed to do.

Under Medicaid practices, Agbeze could submit claims for certain products without first obtaining Medicaid authorization. According to Thompson, Agbeze could submit monthly claims for up to 300 adult diapers, up to 2 boxes of hygienic wipes, and up to 150 underpads. She testified that Agbeze ordered the maximum of each product for multiple clients.

The jury also heard evidence that Agbeze had submitted reimbursement claims for more supplies than his clients had requested. Chavez, an HHSC investigator, testified that her investigation of Agbeze's claims uncovered a noticeable pattern: Agbeze would repeatedly order the maximum number of products allowed without prior authorization, and he would do so for multiple clients. According to Thompson, Agbeze's regular orders for 300 diapers were unusual because the number reflects a "worst case scenario" and "the great majority of people would never need [that many] . . . ." Thompson and Chavez also testified that the size of the diapers—extra-large—was also unusual because most clients did not require diapers that size. Thompson testified that Medicaid pays more for the extra-large diapers than for the smaller sizes and that "if a provider is trying to maximize their billing, whether they provided the service or not, they will bill—you will see consistently billing for extra[-]large [products]." Agbeze

10

admitted at trial that he only provided extra-large diapers, never small or medium-sized products, but maintained that, to "the best of [his] knowledge," all of his clients required the larger size.

In addition to the unusual product orders, the jury could have relied on evidence that Agbeze failed to produce the prescription orders and billing records to substantiate all of the maximum orders. Agbeze admitted that he only provided 119 of the more than 130 files that the State had requested while investigating his billing history. Based on their interview with over 50 of Agbeze's clients, the investigators were unable to account for delivery of all of the products for which Agbeze had submitted reimbursement claims. Based on Agbeze's files and client reports of undelivered products, the investigators concluded that Agbeze had filed claims for products that he never delivered to his clients. One client testified that Agbeze claimed reimbursement for incontinence supplies even though she has never used or requested such products. Another witness testified that Agbeze had claimed reimbursement for his mother's incontinence supplies although she had no need for them. And one witness testified that Agbeze had forged a client signature on a delivery receipt. While Agbeze admitted that he had "mistake[nly]" billed four clients for incontinence supplies, he maintained that he could not "recall exactly" the billing procedures he used for the remainder of his clients.

Despite the great weight of the evidence, Agbeze contends that the client testimony was unreliable because they were "forced . . . to remember events that happened three to seven years prior" and they "contradicted their own testimony throughout the trial." Agbeze also argues that the State's investigators did not corroborate witness testimony and that all of the State's evidence was "highly contested" throughout the trial. Specifically, he cites evidence that he had submitted proper doctor authorizations for his clients. Agbeze further argues that the State failed to disprove "every other reasonable hypothesis."

The State has no obligation to disprove every other plausible theory that could explain Agbeze's actions. *Wise*, 364 S.W.3d at 903; *Cantu*, 395 S.W.3d at 207. Regarding "contested" issues, we presume that the jury reconciled any conflicts in testimony, determined the weight that should be given to the evidence, and made reasonable inferences drawn from the facts. *Williams*, 235 S.W.3d at 750. Accordingly, we conclude that, when viewed in the light most favorable to the verdict, the evidence was sufficient to support the jury's conclusion that Agbeze had intentionally or knowingly committed theft.

## C. Sufficiency of evidence to aggregate the thefts

Agbeze also contends that even if the State proved that he had committed individual instances of theft, there was insufficient evidence that his actions were "part of one scheme or continuous course of conduct such that the amounts of

12

individual thefts could be aggregated." *See* TEX. PENAL CODE ANN. § 31.09. Agbeze argues that he undertook two "different" courses of conduct: (1) submitting billing for Medicaid recipients who were not yet his clients and to whom he made no deliveries and (2) submitting billing for existing clients to whom he made partial deliveries. He further contends that the State admitted that he had committed two different schemes of theft.

A person commits aggregated theft when he commits multiple thefts over a period of time, pursuant to "one scheme or continuing course of conduct, whether from the same or several sources . . . ." *Id.* The Legislature did not attach a technical or particular meaning to "scheme" or "continuing course of conduct"; accordingly we give the words their common meaning. *See* TEX. PENAL CODE ANN. § 31.01 (West 2012); *id.* § 31.09; *Johnson v. State*, 187 S.W.3d 591, 603 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd); *see also Sendejo v. State*, 676 S.W.2d 454, 455–56 (Tex. App.—Fort Worth 1984, no writ) (rejecting argument that State must prove both "scheme" and "continuing course of conduct" and holding words are "terms of common understanding"). Furthermore, the State is not required to prove that the individual thefts were identical or that the actor had "systematic criminal intent" to aggregate offenses. *Riley v. State*, 312 S.W.3d 673, 677–78 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (citing TEX. PENAL CODE ANN. § 31.09).

13

Agbeze cites *Noor v. State*, No. 01–02–01148–CR, 2004 WL 744575 (Tex. App.—Houston [1st Dist.] Apr. 8, 2004, no pet.) (mem. op., not designated for publication) to support his contention that the thefts should not be aggregated because they constituted two different schemes of conduct. Specifically, Agbeze argues that there was insufficient evidence proving "commonalities in the manner and means of the crimes" to affirm the jury's conclusion that his actions constituted a continuous course of conduct.

In *Noor*, there was sufficient evidence to demonstrate that the defendant acted in a continuous course of conduct because each complainant testified that the defendant had contacted them through a third party, the defendant personally offered to sell them discounted merchandise, and the defendant only accepted cash payment. *Id.* at *3. Unlike *Noor*, Agbeze argues that the State failed to present similar factual similarities between his two schemes of conduct.

While common means and manner may support the aggregation of multiple thefts, the State does not have the burden of demonstrating that each theft was factually identical in order to justify aggregation. In *Green v. State*, 880 S.W.2d 797, 799–800 (Tex. App.—Houston [1st Dist.] 1994, no writ), there was sufficient evidence of aggregated theft when the defendant had stolen money in "several ways" including, failing to ring up sales made in the store, failing to deposit cash

14

and checks, making false "overrings" at the cash register, and understating daily sales receipts. *Id.*

Similarly, in *Riley v. State*, this court held that there was sufficient evidence to support an aggregated theft conviction based on evidence that the defendant had stolen money in four different construction transactions. *Riley*, 312 S.W.3d at 673, 676. The defendant argued that there was no proof of a systematic criminal intent; rather, he failed to timely complete the construction projects for unrelated reasons. *Id.* at 677. The appellate court concluded that the evidence was sufficient to support the jury's conclusion that the offenses were part of the same scheme for aggregation purposes based, in part, on evidence that the defendant was paid for projects that were never completed. *Id.* at 674, 677. "[P]rior intent to commit multiple offenses" was not required—the evidence was sufficient to aggregate the offenses based on the common usage of the terms "scheme" and "continuing course of conduct." *Id.* at 677 (citing TEX. GOV'T CODE ANN. § 311.011(a) (West 2013)).

Likewise, the State did not have a burden of proving that Agbeze had a systematic prior intent or scheme to commit theft in every incident evidenced at trial. Rather, based on the common meaning of the terms "scheme" and "continuing course of conduct," the State only had to present evidence that Agbeze's actions were sufficiently linked to support the jury's conclusion to

aggregate the offenses. *See, e.g.*, *Keck v. State*, No. 14–07–00933–CR, 2009 WL 3003257 (Tex. App.—Houston [14th Dist.] Apr. 2, 2009, no pet.) (mem. op., not designate for publication) (upholding aggregation of thefts when evidence showed that defendant had sole access to bank deposit slips necessary to commit 148 instances of theft from his employer).

Here, there was sufficient evidence to support aggregation. First, Agbeze followed a similar method over the course of several years of submitting claims for the maximum allowed number of products, while not maintaining proper documentation to demonstrate client need of those products. Second, Agbeze billed for products that had the highest reimbursement value, regardless of whether the client needed or had ordered such products. Third, Agbeze failed to deliver all of the billed products to some of his clients.[3] Accordingly, we conclude that there was sufficient evidence from which a reasonable jury could infer one scheme or continuing course of conduct to permit aggregation of theft amounts.

Having concluded that there was sufficient evidence that Agbeze acted intentionally or knowingly and that his acts were part of one scheme or continuing course of conduct, a jury could reasonably conclude that Agbeze was guilty of aggregated theft.

---

[3] While there was evidence that Agbeze had delivered some amount of products to some of the clients, Agbeze did not present any evidence to rebut the State's contention that he failed deliver all of the claimed products to all of his clients.

16

We overrule Agbeze's first issue.

## Restitution

In his second issue, Agbeze contends that the restitution order directing him to pay $18,169.45 was "arbitrary and patently unreasonable" based on the evidence presented at trial. We construe Agbeze's complaint as a challenge to the sufficiency of the evidence supporting the amount of restitution imposed. The State argues that Agbeze failed to object to the amount of the restitution at trial and, therefore, did not preserve the error on appeal.

### A.    Waiver

As a preliminary matter, we first consider the State's contention that Agbeze failed to preserve this issue on appeal. To preserve a complaint for appellate review, a party must object in a timely, specific manner and obtain an adverse ruling. TEX. R. APP. P. 33.1(a); *Garza v. State*, 126 S.W.3d 79, 82 (Tex. Crim. App. 2004). However, a challenge to the sufficiency of the evidence supporting a court's restitution order may be raised for the first time on appeal. *Mayer v. State*, 309 S.W.3d 552, 556 (Tex. Crim. App. 2010). Accordingly, Agbeze did not waive the error by failing to challenge the sufficiency of the evidence to support the amount of restitution at trial.

We now turn to consider whether there was sufficient evidence to support the trial court's order directing him to pay $18,169.45 in restitution.

**B.     Standard of review and relevant law**

"Restitution is not only a form of punishment, it is also a crime victim's statutory right." *Hanna v. State*, 426 S.W.3d 87, 91 (Tex. Crim. App. 2014) (citing TEX. CODE CRIM. PROC. ANN. art. 42.037 (West Supp. 2013)). Article 42.037 of the Texas Code of Criminal Procedure authorizes trial courts to order a defendant to pay restitution to compensate a victim, upon considering the value of any property lost or destroyed and other factors that the court "deems appropriate." TEX. CODE CRIM. PROC. ANN. art. 42.037(a), (b)(1)(B)(i), (c)(2).

We review a trial court's order to pay restitution for an abuse of discretion. *Cartwright v. State*, 605 S.W.2d 287, 289 (Tex. Crim. App. 1980); *Uresti v. State*, 98 S.W.3d 321, 337 (Tex. App.—Houston [1st Dist.] 2003, no pet.). A trial court abuses its discretion if the restitution is (1) not supported by the record, (2) ordered for an offense for which the defendant is not criminally responsible, or (3) not for victims of the offense for which the defendant is charged. *See Cabla v. State*, 6 S.W.3d 543, 546 (Tex. Crim. App. 1999); *Tyler v. State*, 137 S.W.3d 261, 266 (Tex. App.—Houston [1st Dist.] 2004, no pet.); *see, e.g.*, *Uresti*, 98 S.W.3d at 337–38 (concluding that restitution based on police department expenses used to complete criminal investigation was improper when the police department was not victim of charged offense).

**C.  Sufficiency of evidence to support the amount of restitution**

Agbeze contends that the total amount of restitution ordered was "a mere 'stab in the dark'" because the losses resulting from Agbeze's partial deliveries were based on unreliable witness testimony that "made it impossible to determine which one of the deliveries were made and which ones were not."

At the sentencing hearing, the State relied entirely upon the evidence presented at trial. We have already concluded that there was sufficient evidence for a reasonable jury to conclude that Agbeze not only filed fraudulent claims, but that he also failed to deliver the total amount of products ordered to his clients. Relying on that same evidence, we likewise conclude that there was sufficient evidence to support the trial court's restitution order.

The jury found Agbeze guilty of theft by a government contractor in an amount greater than $1,500 but less than $20,000, and the restitution imposed falls within the range for which Agbeze was convicted. The record supports the court order imposing restitution in the amount of $18,169.45. The State offered client testimony that Agbeze failed to deliver $8,248.32 worth of products. The State also presented evidence that Agbeze provided only partial deliveries to some clients, resulting in their cumulative loss of over $54,000. While the trial court did not specify which evidence it relied upon to narrow the restitution amount to $18,169.45, there was sufficient evidence to impose restitution in that amount. *Cf.*

*Green v. State*, 880 S.W.2d 797, 802 (Tex. App.—Houston [1st Dist.] 1994, no writ) (concluding that complainant testimony regarding total amount of losses supported trial court's restitution order and noting that defendant had opportunity to controvert testimony regarding the amounts); *Mosqueda v. State*, No. C14–87–00603–CV, 1988 WL 109819 (Tex. App.—Houston [14th Dist.] Oct. 20, 1988, no writ) (mem. op., not designated for publication) (noting that "[t]he amount set for restitution need not be the exact amount of money that was stolen. The amount must simply have a factual basis.").

We conclude that the trial court did not abuse its discretion in imposing the $18,169.45 restitution order. We overrule Agbeze's second issue.

## Conclusion

Having overruled both of Agbeze's issues, we affirm.

Harvey Brown
Justice

Panel consists of Chief Justice Radack and Justices Higley and Brown.

Do not publish. TEX. R. APP. P. 47.2(b).