Sam SEXTON, Jr. *v.* SUPREME COURT COMMITTEE
ON PROFESSIONAL CONDUCT

87-272                                          747 S.W.2d 94

Supreme Court of Arkansas
Opinion delivered March 28, 1988

*Howell, Price, Trice, Basham & Hope, P.A.*, by: *Dale Price*, for appellant.

*Steve Clark*, Att'y Gen., by: *R.B. Friedlander*, Solicitor General, for appellee.

DARRELL HICKMAN, Justice. Sam Sexton, Jr., a Fort Smith lawyer, had his law license suspended for one year by the Supreme Court Committee on Professional Conduct. We must reverse the decision because Sexton was not charged with a violation of a rule of professional conduct that was in existence at the time of his conduct. The committee may proceed against Sexton if he is properly charged.

The charge arose from conduct which occurred in 1983. According to the findings of the committee, when Sexton settled a claim for Danny Haffelder, who was injured in a motorcycle accident, Sexton suggested that Haffelder invest $20,000 in a company called Reclaimed Surface Coal Corporation, a company in which Sexton was involved. Sexton assured Haffelder he would double his money in 40 months. Sexton signed a promissory note to Haffelder for $40,000 as president of the company. Haffelder was paid about $12,000 on his investment, but had to file suit to obtain a judgment for the remaining $28,000. Discussion of the details of this matter are unnecessary to our decision.

Haffelder filed a complaint with the Supreme Court Committee on Professional Conduct. The executive secretary of the committee notified Sexton that he was charged with the violation

of Rules 1.8(a) and 8.4(a) of the Model Rules of Professional Conduct. Rule 8.4(a) is a general rule of misconduct, which reads:

> It is professional misconduct for a lawyer to:
>
> (a) violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another;

The specific rule, Rule 1.8(a), reads:

> (a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:
>
> (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;
>
> (2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
>
> (3) the client consents in writing thereto.

These rules were not in existence at the time of Sexton's conduct. They were adopted on December 16, 1985. *See Per Curiam*, 287 Ark. 495, 702 S.W.2d 326 (1985). At the time of Sexton's conduct, he was governed by the Code of Professional Responsibility which was adopted by our order February 23, 1970. While the rules are similar, they are not the same.

The counterpart to rule 1.8 of the Model Rules of Professional Conduct under the Code of Professional Responsibility was disciplinary rule 5-104(A), which reads:

> A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the

> client has consented after full disclosure.

The old code contained ethical considerations, which served to guide attorneys regarding what was permissible conduct and what was not. One applicable to this situation is EC5-3, which reads in part:

> A lawyer should not seek to persuade his client to permit him to invest in an undertaking of his client nor make improper use of his client to invest in an enterprise in which the lawyer is interested.

■■ Sexton made a timely motion to dismiss the charges against him because rule 1.8 was not in effect when the conduct occurred, but the motion was overruled. The committee was wrong. Due process requires notice that an act is punishable at the time it is committed. *See In Re Inquiry Concerning a Judge*, 357 So. 2d 172 (Fla. 1978). Accordingly, Sexton should have been charged under the rule in effect at the time of the alleged misconduct. *See, e.g., Kelson* v. *State Bar of California*, 549 P.2d 861, 130 Cal. Rptr. 29 (1976); *see also Montgomery County Bar Association* v. *Hect*, 317 A.2d 597 (Pa. 1974); *Attorney Grievance Commission of Maryland* v. *Kerpelman*, 420 A.2d 940 (Md. 1980). It might not matter if the rules were substantively the same, but we find a significant difference between the old rule, 5-104(A) of the Code of Professional Responsibility, and the new rule, 1.8(a) of the Model Rules of Professional Conduct.

■ Sexton also argues the charge should be dismissed. We do not reach this question in view of our decision to reverse the committee's decision on notice and the charge. However, we note that in *Kelson, supra*, the California Supreme Court held that the adoption of new rules of professional conduct is not a bar to a proceeding against a lawyer for an alleged violation of prior rules of professional conduct.

Sexton also argues that the committee was wrong in finding that the attorney/client relationship still existed when the investment was made. Haffelder did not invest the money until June 30, 1983. However, Sexton suggested that Haffelder invest the money the day the settlement proceeds were disbursed. At that time Sexton was still in a position of trust as a lawyer, and later events transpired on the basis of a suggestion Sexton made while

the lawyer/client relationship existed. We cannot say the committee was clearly wrong in finding that the relationship of attorney/client existed.

Reversed and remanded.

HAYS and GLAZE, JJ., dissent.

STEELE HAYS, Justice, dissenting. There is nothing to be gained by remanding this case. In the first place, we review the record *de novo* and do not reverse the findings of the committee unless they are clearly erroneous. *Muhammed* v. *Arkansas Supreme Court Committee on Professional Conduct*, 291 Ark. 29, 722 S.W.2d 282 (1987). Moreover, this case was the subject of a lengthy hearing and a full inquiry by the committee, and neither side suggested the need for additional proof.

The charges by Mr. and Mrs. Haffelder against Mr. Sam Sexton, Jr., were defended entirely on the contention that Mr. Sexton and Mr. and Mrs. Haffelder were *at no time* in an attorney-client relationship. The hearing was focused on that issue alone. The argument that these events occurred before the effective date of the Model Rules of Professional Conduct, while mentioned in passing at the commencement of the hearing, was otherwise ignored. There was no proof whatever that the actions by Mr. Sexton of which the Haffelders complained were not improper prior to the adoption of the Model Rules. Moreover, essentially the same conduct is prohibited under the Code of Professional Responsibility. See DR 5-104(A). Certainly there was no attempt by Mr. Sexton to show that he complied with *either* rule by informing the Haffelders about the transaction. There is no testimony that Mr. Sexton met the requirement of "full disclosure" to the Haffelders as to the pros and cons of the transaction. Mr. Sexton testified that he thought it was a good investment for them and that Mr. Haffelder regarded it as "a favor" by Mr. Sexton. There is no mention of any risk involved, but it is implicit in Mr. Sexton's account of the transaction, in the form of a loan, that it was patently usurious, in that the $20,000 was to be repaid at $1,000 a month for forty months. There seems to have been no disclosure of that material fact. It is the appellant's duty to demonstrate error in the proceedings below and to present a record for which it can be determined on review that error occurred. *S.D. Leasing, Inc.* v. *RNF Corp.*, 278 Ark.

530, 647 S.W.2d 447 (1983); *Kimery* v. *Schockley*, 226 Ark. 437, 290 S.W.2d 442 (1956). This he has failed to do.

As to whether Mr. Sexton and Mr. and Mrs. Haffelder stood in an attorney-client relationship, only one conclusion is possible. The proof is overwhelming. Mrs. Haffelder, acting for her husband while he was hospitalized from his injuries, testified that she called the Sexton firm, that she spoke with Mr. Sexton and he agreed to represent them. Often thereafter she and her husband would meet with Mr. James Robb or Mr. Bennett Nolan, younger lawyers with the firm, but they always considered Mr. Sexton their lawyer and always asked first to meet with him. Mr. Haffelder's testimony corroborated Mrs. Haffelder's. While Mr. Sexton denied that he ever spoke with Mrs. Haffelder, the finding of the committee was clearly to the contrary.

If any doubt of Mr. Sexton's status were to remain, the documentary evidence dispels it entirely. When the discovery deposition of Mrs. Nancy Clower, the opposing litigant, was taken, Mr. Sexton appeared as attorney for the Haffelder's, and it was he who did the questioning. Much of the correspondence between the Sexton firm and Mr. Hugh Hardin, attorney for the Clowers's insurance carrier, was between Mr. Sexton and Mr. Hardin. Of eleven items of correspondence flowing from Mr. Hardin, seven were addressed to Mr. Sexton, three to Mr. James Robb and none to Mr. Nolan, whom Mr. Sexton contends was "lead" counsel. In one letter to Mr. Sexton, Mr. Hardin states, "In your representation of this young man" (referring to Mr. Haffelder) and proceeds to ask for income tax records. There is correspondence between Mr. Walter Niblock, who represented Mrs. Clower individually, to the carrier, urging settlement within the policy limits, and stressing Mr. Sexton's effectiveness in trial. This letter assumes that Mr. Sexton alone is representing the Haffelders. There are several letters from Mr. Sexton proposing settlement and evidencing an intimate knowledge of the case. The settlement itself, according to Mr. Hardin's records, was reached between Mr. Hardin and Mr. Sexton. The compromise settlement agreement, a detailed document, was approved by Mr. Sexton, as "attorney for the Haffelders," the settlement check of $90,000 was endorsed by Mr. Sexton, and the joint order of dismissal of the cause with prejudice was approved by Mr. Sexton and Mr. Hardin, and it was Mr. Sexton who met with the

Haffelders at the settlement conference. Lastly, it should be noted that when Mr. and Mrs. Haffelder sued Mr. Sexton some two years later, requests for admissions were served on Mr. Sexton, the first of which was a request that he admit an attorney-client relationship had existed with the Haffelders. This request was never denied.

It is true that Mr. James Robb and Mr. Bennett Nolan of the Sexton firm, testified that Mr. Sexton never represented the Haffelders, that they retained Mr. Nolan to represent them and he brought Mr. Robb into the case, and because they were younger, they were merely drawing on Mr. Sexton's experience and prestige. But even if Mr. Sexton were not expressly retained by the Haffelders, by assuming an active, high-profile role in their behalf, Mr. Sexton gave the Haffelders every right to assume that an attorney-client relationship existed. The relationship is not dependent on an express agreement, it may be implied on the part of an attorney who acts in behalf of his client in pursuance of a request by the latter. *Hirsch Bros. & Co.* v. *R. E. Kennington Co.*, 124 So. 344 (Miss. S. Ct. 1929); 88 A.L.R. 1; Corpus Juris Secundum, Vol. 7A, § 169, p. 250.

I respectfully submit on this record the committee should be affirmed.

GLAZE, J., joins this dissent.