2010 Ark. 226

**Stark LIGON, Executive Director, Supreme Court Committee on Professional Conduct, Appellant,**

v.

**Frank David REES, Ark. Bar No. 79238, Appellees.**

No. 09–559.

Supreme Court of Arkansas.

May 13, 2010.

Stark Ligon, Supreme Court Comm. on Prof'l Conduct, Little Rock, for appellant.

Friday, Eldredge & Clark, LLP, by: Donald H. Bacon and Martin A. Kasten, and Asa Hutchinson Law Group, PLC, by: Asa Hutchinson and Asa Hutchinson, III, Little Rock, for appellee.

ELANA CUNNINGHAM WILLS, Justice.

This case is an appeal from a disciplinary action by the Supreme Court Committee on Professional Conduct (Committee) against attorney David Rees. The Committee's Executive Director, Stark Ligon, brings this appeal from a February 23, 2009 order filed by Panel C of the Committee suspending Rees's law license for thirty days upon a finding that he violated two provisions of the Arkansas Model Rules of Professional Conduct (Model Rules). In this appeal, Director Ligon raises four arguments for reversal or modification of the Panel's order: (1) suspension of Rees's law license for only thirty days was "not appropriately or proportionately substantial or severe for the overall misconduct proven"; (2) a finding of no violation of Model Rule 8.4(c) for Count H.1 was clearly against the preponderance of the evidence; (3) a finding of no violation of Model Rule 8.4(c) for Count H.2 was clearly against the preponderance of the evidence; (4) a finding of no violation of Model Rule 1.6(d) for Count F.1 was clearly against the preponderance of the evidence. We affirm the Panel's order.[1]

The formal charges of misconduct in this case arose from a complaint filed by Rees's former client, Tom Papachristou, involving a fee dispute. Rees's representation of Papachristou began after Papachristou was arrested and jailed in Crittenden County on March 18, 2004, for violating a protective order granted to his on-again, off-again companion and office manager, Kim Crockett. Papachristou paid a total of $29,500 for Rees's representation in the protective-order matter in the form of a $27,500 check and $2,000 in cash. In May 2004, Papachristou also retained Rees's services for his role as a target of an ongoing federal criminal investigation involving the illegal transfer of registration or serial numbers of jet aircraft engines. On May 26, 2004, Papachristou paid Rees a $125,000 retainer for representation in the federal criminal matter, followed by another check in the amount of $100,000

---

1. This appeal is one of four involving Mr. Rees styled *Ligon v. Rees*, submitted to this court and handed down this same day. *See* docket numbers 09–555, 364 S.W.3d 19, 09–556, 364 S.W.3d 28, 09–560, 364 S.W.3d 1.

paid to Rees on May 31, 2004, to be held and used in the event that he was actually indicted and charged. Papachristou made additional payments for Rees's representation in other business matters.

One such business matter involved a company called Omni Holding & Development Corporation (Omni). Attorney Kent Rubens of West Memphis originally represented Crockett in relation to various business interests she and Papachristou were engaged in, including Omni. On March 4, 2004, Joe Volpe, an Assistant United States Attorney (AUSA) for the Eastern District of Arkansas, mailed a letter to Rubens requesting an interview between Crockett and FBI Special Agent John Hazen in connection with the federal criminal investigation "involving others including Ms. Crockett." The letter stated "[a]t this time, our intention is not to prosecute Ms. Crockett given the information we have before us," and that her "cooperation is her greatest opportunity to not be swept up in this criminal case." A "Proffer Agreement" was attached to the letter providing Crockett with "use immunity" for any information she provided to federal agents or United States attorneys. Crockett, Rubens, and AUSA Volpe signed the immunity agreement on March 10, 2004.

In addition to the federal criminal investigation, Rubens represented Crockett in Papachristou's aforementioned violation of her protective order on March 18, 2004. On May 7, 2004, the Crittenden County Circuit Court entered an "Agreed Order" in which Crockett and Papachristou, through their respective attorneys, Rubens and Thomas Young of the Rees Law Firm, dismissed the protective-order claim and converted the case to a paternity action.

On May 10, 2004, the circuit court entered a judgment and commitment order upon Papachristou's guilty plea for the misdemeanor charge of violating Crockett's protective order. According to Crockett's March 1, 2007 affidavit, she terminated Rubens's services as her attorney on May 27, 2004.[2] Crockett stated that she made her decision to terminate Rubens as her counsel "[a]s a result of [ ] conversations" with Rees and Papachristou regarding the federal criminal investigation.

On June 1, 2004, AUSA Volpe sent a fax to Rubens, Rees, and another attorney at the Rees Law Firm, Joe Hughes, as well as another named Steven Farese, stating that Volpe had received telephone calls from each regarding Papachristou and Crockett, and "the investigation involving the removal of data plates from aircraft" in West Memphis. The fax expressed confusion over which attorneys currently represented Papachristou and Crockett, stating that

> [o]riginally, Mr. Farese contacted me as Mr. Papachristou's attorney. Later Mr. Rees stated he and Mr. Farese represented him. Mr. Rubens originally represented Ms. Crockett, but on May 27, 2004, Mr. Rees notified me that he now represents Ms. Crockett. On May 28, 2004, Mr. Hughes contacted me to inquire about Ms. Crockett.

The letter concluded with Volpe directing the attorneys to contact him in writing regarding the federal investigation in the future to "avoid any conflict or confusion." Rees mailed a letter to AUSA Volpe on June 2, 2004, "to notify [Volpe] that I am representing Kim Crockett and Tom Papachristou" and that Rubens was no longer Crockett's counsel.

Rees mailed a letter to Rubens dated June 3, 2004, with a proposed order at-

---

**2.** This termination apparently occurred the day after Papachristou retained Rees in the federal investigation and paid Rees a $125,000 retainer fee.

tached that substituted Rees as Crockett's counsel in a civil action involving Omni. Rubens signed the proposed order after receiving Rees's letter on June 8, 2004. On June 23, 2004, Crockett, represented by attorney Joe Hughes, filed suit against Rubens in the Crittenden County Circuit Court for breach of fiduciary duty and the tort of outrage. Rubens denied Crockett's allegations in his answer to the complaint filed on July 12, 2004, and moved for dismissal under Ark. R. Civ. P. 12(b)(6). The circuit court granted Crockett's oral motion to nonsuit the action against Rubens on November 22, 2004.

According to the Panel's order in the interim between the filing and nonsuit of the complaint against Rubens, Rees went to the home Crockett shared with Papachristou while Papachristou was out of the county and an incident occurred that personally upset her. After Crockett related the incident to Papachristou upon his return, they sent a letter dated October 13, 2004, to Rees stating that it was their "mutual and joint desire to terminate the attorney-client relationship between the Rees Law Firm, yourself, and us on an individual basis." Additionally, the letter terminated Rees's representation of either party regarding Omni, and specifically stated that Papachristou did not want Rees to represent him "in any way" in the federal investigation or charges, and that Crockett did not want Rees to represent her "in any individual fashion," including the action filed against Rubens. Further, Papachristou requested that Rees "account to me for all funds which have been paid to you and provide me with a detailed accounting for time and expenses," as well as "a complete refund of all unearned fees." The letter closed with a notice that Rees was not to "contact us in person or by phone to discuss this matter further," and if Rees had any questions he should direct them to Papachristou's attorney, Paul Ford, or Crockett's attorney, Thomas Fowler.

On October 14, 2004, Ford faxed a letter to Rees stating that his client Papachristou had informed him that Rees attempted to contact Papachristou by phone despite notification that all communication was to be with Ford. Ford referenced transfer of Papachristou's files and Papachristou's desire to receive an "accounting of funds paid, and a refund of any unearned retainer." Ford sent a second fax to Rees on October 22, 2004, stating that because Rees had failed to provide the accounting and refund of unearned fees, Papachristou would file an ethical complaint if Rees did not provide the accounting and refund within ten days.

Rees responded with a letter to Ford dated October 29, 2004, enclosing Papachristou's un-deposited $100,000 check with an attached document entitled "Accounting of Monies Received by Rees Law Firm RE: Tom Papachristou." The document listed a series of dates with payments by Papachristou, amounts listed as "confirmed," one amount listed as "sent for collection" and another a payment to "Mike Morgan Investigations," and stated the total amount received from Papachristou as $172,000. Rees's letter included an overview of his work on Papachristou's behalf and statements that he would later detail certain costs and "a generalization, as specifically as I can be as to what activities I actually did for [Papachristou]."

Director Ligon mailed a letter to Rees dated December 15, 2004, stating that Papachristou had filed a complaint with the Committee on November 14, 2004, based on Rees's failure to provide an accounting and refund of legal fees. Director Ligon wrote, "This letter is an informal attempt to see if this matter can be resolved between attorney and client without further

consideration by this office." Further, "[i]f I have heard nothing further from the complainant by February 1, 2005, I will assume the matter was satisfactorily resolved and I will probably close the file with no further action." Attorney Arlon Woodruff, representing Rees, responded to Director Ligon's December 15, 2004 letter with a "summary of events surrounding the representation" of Papachristou. The letter concluded by stating that, "We have no hesitancy in defending this matter" and that further examination would show that Papachristou's complaint to the Committee "is not worthy of your time."

On January 5, 2005, Papachristou filed a complaint against Rees and the Rees Law Firm in the Craighead County Circuit Court for breach of contract and fiduciary duty. The complaint alleged that Papachristou and Rees entered into an unwritten "contractual arrangement" for Rees's services in the federal criminal investigation, but that Rees's subsequent representation of Crockett in the same investigation created a "conflict of interest that prohibited their proper representation." Similarly, the complaint alleged that Rees breached his fiduciary duty by representing both Papachristou and Crockett—"an individual providing incriminating testimony to the government in the investigation for which [Rees] had been retained"—and by failing to refund legal fees. Further, the complaint alleged that Rees breached his fiduciary duty "with malice" by making knowingly false statements in "an effort to justify the refusal to refund the $125,000 paid by [Papachristou]." The parties settled the case and Papachristou dismissed the complaint in May 2006.

On April 26, 2007, Executive Director Ligon served Rees with an ethics complaint that alleged certain violations of the Model Rules, including Rules 1.7(a), 1.7(b), 8.4(c), and 1.16(d). Rees responded to the complaint on September 10, 2007, denying Director Ligon's allegations. Both Papachristou and Crockett sent letters rebutting Rees's response. Additionally, attorney Ford mailed a letter addressing various representations made by Rees in his response. Following a ballot vote by Panel A of the Committee, Panel C held public hearings on the matter on February 4 and 5, 2009. In its February 23, 2009 order, Panel C found that Rees violated Model Rules 1.7(a) and 1.7(b) and suspended his license for thirty days. Specifically, Panel C found that Rees violated Model Rule 1.7(a) as alleged in counts C.1 and C.2 of the complaint, in that he represented both Papachristou and Crockett—clients with adverse interests—without explaining to Crockett the risks to her or obtaining her consent. Panel C found a violation of Model Rule 1.7(b) with regard to Count D.1 of the complaint in that he undertook the representation of Crockett at a time when he already represented Papachristou, and Rees could not have reasonably believed that the representation would not be materially limited or adversely affected by his responsibilities to Papachristou. Panel C found no other violations of the Model Rules as alleged in the complaint. Director Ligon then filed this appeal.

The standard of review for an appeal from the Committee is as follows: Pursuant to Section 12(B) of the Procedures [Regulating Professional Conduct], on appeal, this court carries out a *de novo* review on the record. A *de novo* review on the record determines whether the factual findings were clearly erroneous, or whether the result reached was arbitrary or groundless. Due deference is given to the Committee's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimo-

ny. However, conclusions of law are given no deference on appeal. The Committee's findings of fact will not be reversed unless the findings are clearly erroneous, and the action taken by the Committee will be affirmed unless it is clearly against the preponderance of the evidence. Additionally, a finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Stilley v. Supreme Court Comm. on Prof'l Conduct*, 370 Ark. 294, 301, 259 S.W.3d 395, 399 (2007) (citations omitted).

For his first point on appeal, Director Ligon argues that Rees's thirty-day suspension ₉for serious misconduct was not "appropriate or proportionately substantial or severe for the overall misconduct proven." In support of his argument, Director Ligon recites and emphasizes various evidence presented to the Committee, including Rees's letter to AUSA Volpe confirming his representation of both Papachristou and Crockett and Rees's own deposition testimony, to the effect that the conflict "absolutely" benefitted Papachristou. Director Ligon contends that Rees's dual representation of Papachristou and Crockett was undertaken to "control her" to benefit Papachristou, and that the dual-representation put Crockett at risk of losing her "vital federal immunity agreement." Citing the examples of the disciplinary proceedings involving President William J. Clinton and attorney Richard Young, Director Ligon asserts that Rees's serious misconduct merits a "lengthy suspension somewhere in the range" of those two cases. Director Ligon acknowledges that Panel C "rightly found" that Rees's

dual-representation of Papachristou and Crockett was a conflict of interest in violation of the Model Rules and serious misconduct warranting the sanction of suspension. However, he contends that Rees's dual-representation of Papachristou and Crockett is "egregious" misconduct "demanding more than a minimal thirty (30) day license suspension."

The Procedures Regulating Professional Conduct Section 17(B) and (C) (2004) defined misconduct as follows:[3]

B. Serious Misconduct. Serious misconduct is conduct in violation of the Model Rules that would warrant a sanction terminating or restricting the lawyer's license to practice ₁₀law. Conduct will be considered serious misconduct if any of the following considerations apply:

(1) The misconduct involves the misappropriation of funds;

(2) The misconduct results in or is likely to result in substantial prejudice to a client or other person;

(3) The misconduct involves dishonesty, deceit, fraud, or misrepresentation by the lawyer;

(4) The misconduct is part of a pattern of similar misconduct;

(5) The lawyer's prior record of public sanctions demonstrates a substantial disregard of the lawyer's professional duties and responsibilities; or

(6) The misconduct constitutes a "Serious Crime" as defined in these Procedures.

C. Lesser Misconduct. Lesser misconduct is conduct in violation of the Model Rules that would not warrant a sanction terminating or restricting the lawyer's license to practice law.

---

3. As did the Panel, we apply the version of the Model Rules and Procedures in effect at the time of Rees's conduct. *See Sexton v. Su-* *preme Court Comm. on Prof'l Conduct*, 295 Ark. 141, 747 S.W.2d 94 (1988).

Under Section 17(D)(1), the most severe sanction for misconduct is disbarment: "The termination of the lawyer's privilege to practice law and removal of the lawyer's name from the list of licensed attorneys." After disbarment, the most severe sanction is suspension under Section 17(D)(2), limiting the attorney's privilege to practice law for a fixed period of time.

By a unanimous vote, Panel C found that Rees's dual-representation of Papachristou and Crockett violated Model Rule 1.7(a) and (b). The applicable version of Model Rule 1.7 (2004) provided that

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. When representation of multiple clients is undertaken, the consultation shall include explanation of the implication of the common representation and the advantages and risks involved.

Panel C found that Rees violated Model Rule 1.7(a) in that, "after Kim Crockett was induced to terminate the services of her attorney, Mr. Rubens," Rees failed to explain "the risk to her, and to any benefit or immunity she might otherwise enjoy for her cooperation under her Proffer Agree-ment" in the federal investigation of Papachristou. Further, Rees failed to obtain Crockett's "consent to the dual representation after any effective consultation with her on the conflict issue." The Panel found that Rees's "main interest in representing Kim Crockett was to benefit his other client, Tom Papachristou," and that

[u]nder the circumstances, and given Rees's experience as a criminal defense attorney, Rees could not have then reasonably believed that his existing representation of Tom Papachristou would not adversely affect his relationship with Kim Crockett as his new client in the same criminal investigation.

Similarly, the Panel found that Rees violated Model Rule 1.7(b), stating that

[u]nder the circumstances known to Mr. Rees at the time, and given his substantial experience as a criminal defense attorney, he could not have, at the time, reasonably believed his representation of Ms. Crockett would not be materially limited or adversely affected by his responsibilities to his existing client in the same matter, Tom Papachristou, Crockett's long-time business partner and paramour.

The Panel's findings that a preponderance of the evidence showed that Rees violated Model Rule 1.7(a) and (b) are not challenged by Director Ligon on appeal. Nor did Rees file a cross-appeal challenging the Panel's findings and sanction. Under Section 17(E)(2) of the Procedures Regulating Professional Conduct, a panel of the Committee is authorized to "suspend the lawyer's privilege to practice law for a fixed period of time not in excess of five (5) years." Section 17(E)(2) further provides that, "[s]uspension is appropriate when a panel of the Committee finds that the lawyer has engaged in 'serious misconduct' and ... the nature and degree

of such misconduct do not warrant disbarment." Thus, the Panel's sanction of a thirty-day suspension of Rees's law license was within the range of sanctions for violations of the Model Rules.

Further, Rees argues that this court has rejected comparisons of sanctions imposed in other disciplinary cases, such as Director Ligon makes in urging imposition of a more lengthy suspension of Rees's license to practice law. Rees cites *Colvin v. Committee on Professional Conduct*, 309 Ark. 592, 595, 832 S.W.2d 246, 247–48 (1992), where this court stated as follows:

> Appellant recognizes that, upon a finding of a violation of a the Model Rules, the Committee may suspend him. He alternatively argues that, even if the Committee's decision that he violated the rule is affirmed, it should be modified to conform to precedents established by the Committee. Without authority or convincing argument he asserts that the sanctions made public and published "in the larger state newspapers and the *Arkansas Bar Journal*" should be considered as precedent and applied to this case. The argument is without merit for a number of reasons. First, there is reason to question the validity of appellant's statistics used in his argument because he uses statistics compiled from only August through October of 1989. Second, subject to certain exceptions, confidentiality of all communications, complaints, formal complaints, testimony, and evidence based upon a complaint is absolutely privileged. As a result, the facts of each Committee decision made public are not revealed or made known to this court for any consideration or determination of precedential value. Third, even if the statistics were valid, we have stated in the context of criminal law that we will not reduce or compare sentences that are imposed within statutory limits. In the civil context of damages awards, a comparison of awards made in other cases cannot be relied on as a measure of excessiveness. Thus, we reject the argument.

*See also Clark v. Supreme Court Comm. on Prof'l Conduct*, 320 Ark. 597, 601, 898 S.W.2d 446, 449 (1995) (stating that, "In *Colvin*, [ ] we noted that in the context of criminal law we will not reduce or compare sentences that are imposed within statutory limits," and "that in the civil context of damage awards, a comparison of awards made in other cases cannot be relied on as a measure of excessiveness"; "[c]onsequently, because the Committee's action was within the range of sanctions for a violation of a provision of the Model Rules, we affirmed the Committee's decision.").

Director Ligon responds in his reply brief by dismissing *Colvin* as "a case now almost twenty years old, and from an era when Committee sanctions were not readily available online to the public and attorneys as they have been since 2001." Director Ligon, however fails to note that the *Colvin* court rejected the appellant's use of limited examples for purposes of comparison and applied a criminal rule rejecting comparison of sentences where a sentence is "imposed within statutory limits." *Colvin*, 309 Ark. at 595, 832 S.W.2d at 248. Here, Director Ligon supplied the examples of only two disciplinary cases, even though he states in his reply brief that the "body of attorney discipline case law, both from the Committee and from the Court, has expanded considerably since 1991, and now offers a more substantial basis for case comparison in search for the appropriate sanction in a new case." Further, as noted above, the Panel's sanction of Rees by suspending his law license for a fixed

period of time is within the range of sanctions provided under the Procedures Regulating Professional Conduct.

Finally, Director Ligon points to the holding in *Ligon v. Price,* 360 Ark. 98, 113, 200 S.W.3d 417 (2004) in his attempt to distinguish *Colvin* and persuade this court to follow his comparison of outcomes in disciplinary proceedings to increase the length of Rees's suspension. Director Ligon claims that in *Price,* "this [c]ourt took the position that comparability and proportionality are appropriate inquires in attorney discipline cases." In *Price,* this court rejected the appellant's argument that the special judge failed to conduct a "comparability and proportionality analysis," and noted that the special judge "effectively analyzed the thirty-five factors that lent themselves to consideration of comparability and proportionality." *Price,* 360 Ark. at 114, 200 S.W.3d at 427. The court did not hold that "comparison and proportionality are appropriate" by looking to other disciplinary cases not involving that attorney as Director Ligon asserts. Instead, in responding to the appellant's argument for "comparability and proportionality analyses," the *Price* court simply noted that the appropriate factors under Section 17 of the Procedures were considered.

In sum, with regard to Director Ligon's first point on appeal, the Panel's findings were not clearly erroneous and the suspension of Rees's law license for thirty days was within the range of sanctions for violations of the Model Rules.

For his second point on appeal, Director Ligon argues that Panel C's unanimous determination that Rees did not violate Model Rule 8.4(c) as alleged in Count H.1 of the complaint was clearly erroneous and against a preponderance of the evidence.

Under Model Rule 8.4(c) (2004), it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Director Ligon alleged as follows in Count H.1:

On March 24, 2004, you contracted in writing for the legal representation of Tom Papachristou on his matter in West Memphis municipal court for a fee of $15,000, to be earned at $150 per hour, and accepted a total of $29,500 from him or paid on his behalf by that date. On the same day you transferred $20,000 from your trust account to the firm account, where you already had deposited $2,000 paid in cash for Papachristou on March 23, 2004, for a total of $22,000 by then placed in your firm account. Since your firm could not possibly have earned in fees anywhere near the $22,000 you caused to be placed in your firm account from the retainer he paid you, you failed to hold property in your possession belonging at the time to Tom Papachristou in a trust account separate from your own funds. By taking as earned, and therefore yours, these funds from your trust account, you engaged in conduct involving dishonesty, fraud, deceit or misrepresentation.

Former Rees Law Firm assistant Ashley McAnulty testified before the Panel that she filled in a "Rees Law Firm attorney client contract" dated March 24, 2004, for Papachristou's representation in the protective order matter. The contract provided for a nonrefundable $15,000 retainer fee, and after the retainer fee was exhausted "by a credit set-off of $150 per hour," Papachristou would be billed at an hourly rate of $150 per hour. McAnulty, *however,* also stated that "none of the attorneys" at the Rees Law Firm, including Rees himself, "ever charged by the hour."

Cynthia Copeland Womble, office manager for the Rees Law Firm, testified be-

fore the Panel that Rees summoned her to pick up a check in connection with Papachristou's representation. Rees told her that $7500 of the $27,500 check was to be paid to investigator Mike Morgan and the remaining $20,000 "was for fee." Womble testified that she deposited the check into the firm's escrow account and then wrote checks to Morgan for $7500 and to the Rees Law Firm for $20,000. She also testified that the firm received $2000 in cash from Papachristou prior to the receipt of the $27,500 check, and that "it all relate[d] to a contract for $15,000." Additionally, Womble testified that in her sixteen years working for Rees, she "never knew him to charge by the hour in a personal injury or criminal matter," that she was "shocked" to see an hourly contract, and that "there was no time accounting system for the lawyers within the firm" that would provide for hourly billing.

In addition to Rees's own testimony regarding his agreement to represent Papachristou in the matter of the protective-order violation, Panel C considered the deposition testimony of an Arkansas criminal defense attorney with over twenty-five years of experience who testified that it is difficult to determine a reasonable fee in a criminal defense "because you don't know how complicated the case is," and that "I think any lawyer that bases his fee solely on an hourly rate is crazy." The expert witness further testified that "[w]hen I receive a criminal fee . . . [i]t is my rule of thumb that everything less than $30,000 goes in the operating [account], and the excess goes into the trust account."

Although, there was conflicting evidence relating to Count H.1, under this court's standard of review we give deference to the Committee's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony. *See Stilley, supra.* The question of whether Rees's conduct was dishonest, fraudulent, deceitful, or a misrepresentation involves the weight of the evidence and credibility of witnesses. Therefore, we are unable to say that the unanimous finding of the Panel that Rees did not violate Model Rule 8.4(c) as alleged in Count H.1 was against the preponderance of the evidence, arbitrary, or groundless.

For his third point on appeal, Director Ligon similarly argues that Panel C's unanimous determination that Rees did not violate Model Rule 8.4(c) as alleged in Count H.2 of the complaint was clearly erroneous and against a preponderance of the evidence. In Count H.2, Director Ligon alleged that

> [b]y claiming in October 2004 and thereafter that you owed Tom Papachristou no refund on the $125,000 in fees he paid you in May 2004, for your work on his federal criminal matter, when your documented work for him consists of a file containing only fifteen (15) sheets of paper, apparently only two letters on his behalf you wrote to the federal officials in the case, and several short telephone calls you had with Assistant United States Attorney Joe Volpe, you engaged in conduct involving dishonesty, fraud, deceit or misrepresentation with regard to your claimed effort in the matter and the portion of the $125,000 fee you had actually earned. Model Rule 8.4(c) requires that a lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

On appeal, Director Ligon asserts that Rees's denial that he owed Papachristou any refund until the end of Papachristou's suit to recover the fees was "stalling" and, therefore, a violation of Model Rule 8.4(c) as "conduct involving dishonesty, fraud, deceit, or misrepresentation." Rees counters that there was a legitimate fee dispute over the amount of the unearned fees.

Here, Panel C considered Rees's testimony that a legitimate fee dispute existed, including the problems involved with the representation of a difficult client who was often out of the country, hiring investigators and assembling a defense team, and the amount of time he spent working on Papachristou's federal criminal investigation, apart from the documentary evidence cited by Director Ligon in Count H.2 of the complaint. Rees's office manager testified that the firm received an "abnormal" amount of telephone calls from Papachristou—more than any other client in her sixteen years at the firm—and that Rees "spent the majority of his time" on Papachristou's calls. Additionally, the Panel considered the testimony of an expert witness who opined that it was "not uncommon to gain no results" at the stage of the case of Papachristou's federal criminal investigation when he dismissed Rees as his attorney, and that "[y]ou could spend a lot of time working on a case just learning about it ... but have zero to show for it other than you spent the labor." Thus, as above, the unanimous finding of the Panel that Rees did not violate Model Rule 8.4(c) as alleged in Count H.2 was not against the preponderance of the evidence, arbitrary, or groundless.

For his fourth and final point, Director Ligon argues that Panel C's finding that Rees did not violate Model Rule 1.16(d) as alleged in Count F.1 of the complaint was clearly erroneous or against the preponderance of the evidence.

> Model Rule 1.16(d) (2004) required that [u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any ad-

vance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.

Count F.1 of the complaint alleged that

> Papachristou terminated your legal services in October 2004, and requested a refund of unearned fees he had paid you in his federal criminal matter. In October 2004, you informed him and his new counsel that he was not due any refund for the $125,000 advance fee he had paid you in May 2004 for future representation in a federal criminal investigation. In January 2005, Mr. Papachristou sued you for this amount. On the eve of trial in May 2006, you settled by paying Mr. Papachristou the full $125,000, plus more for another matter, totaling $140,000 in all.

On appeal, Director Ligon argues that Rees

> stalled [Papachristou] for eighteen (18) months before settling with him on the eve of trial for practically the entire amount demanded. An attorney reasonably familiar with the Rules would have known of Model Rule 1.15(c) (2004) which states, "(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interest. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved." Rees owed [Papachristou] a prompt, large refund of the undisputed portion of the $125,000. Unfortunately, Rees took the position that he disputed it all, as being earned by him, and clung to that position until he paid it all back in 2006.

To the extent that Director Ligon argues that Rees violated Model Rule 1.15(c)—or, violated Rule 1.16(d) by violating 1.15(c)—this argument is raised for the first time on appeal; thus, this court will not consider it. *See, e.g., Stilley v. Supreme Court Comm. on Prof'l Conduct,* 370 Ark. 294, 301, 259 S.W.3d 395, 399 (2007) ("A review of the hearing reveals that Stilley did not object to the brief not being part of the record nor did he attempt to have the brief made part of the record. It is an elementary principle of administrative law that an issue must be raised at the hearing below in order to be raised on appeal."). Further, as discussed above, the Panel considered testimony, depositions, and affidavits regarding Rees's representation of Papachristou and the fee dispute itself, and this court defers to the Committee's determination of the credibility of the witnesses and the weight to be accorded to their testimony. Accordingly, the unanimous finding of the Panel that Rees did not violate Model Rule 1.16(d) is not clearly against the preponderance of the evidence, arbitrary, or groundless.

Finally, although Director Ligon raises several "aggravating factors" for our consideration in addressing this appeal, he failed to raise these aggravating factors before the Panel; accordingly, we will not address them. *See Stilley, supra.*

Affirmed.