**AFFIRM**; and Opinion issued April 30, 2013.



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

_____

**No. 05-11-00259-CR**
_____

**MONICE MCKEE ANDERSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 1**
**Dallas County, Texas**
**Trial Court Cause No. F10-51906-H**

## OPINION

Before Justices Murphy and Richter[1]
Opinion By Justice Richter

Appellant Monice McKee Anderson was charged by indictment with capital murder. A jury found him guilty as charged, and the trial court assessed punishment of confinement for life in the Institutional Division of the Texas Department of Criminal Justice. Appellant raises five issues on appeal. Appellant challenges the sufficiency of

---

[1] The Honorable Martin E. Richter, Retired Justice, sitting by assignment. The Honorable Joseph Morris was on the panel and participated at the submission of this case. Due to his retirement from this Court on December 31, 2012, he did not participate in the issuance of this Opinion. *See* TEX. R. APP. P. 41.1(a), (b).

the evidence to support his conviction for capital murder. Appellant also argues the trial court erred by denying his request for an instruction on the lesser included offense of murder, admitting cell phone records into evidence, allowing the in-court identification by witness Calixto, and admitting accomplice witness testimony into evidence. Finding no reversible error, we affirm the trial court's judgment.

## I. BACKGROUND

### A. Testimony At Trial

Dallas police officer Juan Hernandez testified that on January 10, 2009, the police department received a call that someone had been shot at 8701 Lake June Road. Officer Hernandez and his partner were dispatched to the scene and upon arriving, they were met by a Hispanic man waving his hands in the air, saying someone inside the house had been shot. When Officer Hernandez went into the house, he immediately saw a man whose "arm was practically blown off." It was apparent that the complainant, Rafael Duarte, was dead. Officer Hernandez was told by witnesses that three Black males were involved in the shooting. One witness also told him that a white vehicle was involved. Officer Hernandez testified he was told that one Hispanic male left the scene in a black SUV to go after the suspects. This Hispanic male later returned to the scene and spoke with detectives.

Lisa Bowers, a crime scene analyst for the Dallas Police Department, testified that she responded to the scene of the shooting to take photographs and collect evidence. Among other evidence, she collected beer bottles, a revolver found under a sofa cushion, and unfired shotgun shells. She processed the shotgun shells and beer bottles for

fingerprints. Finding prints on the beer bottles, she submitted them for comparison. One fingerprint was identified as belonging to Phaylon Wamsley.

Miguel Martinez testified that on December 31, 2008, he went to a gun store to buy bullets for the shooting range. Martinez began talking to a man called "P" who was buying bullets for a .38 caliber gun. Martinez identified a photograph of Phaylon Wamsley as "P" and a photograph of Derric Elmore as the man who was with Wamsley at the gun store. Wamsley offered to sell his .38 to Martinez for $200 so Martinez followed Wamsley and Elmore to Wamsley's house to see the gun. Wamsley's gun was a .380, not a .38, so Martinez told Wamsley he did not want to buy it. During their conversation, Wamsley asked Martinez if he knew anyone who could sell him seven pounds of marijuana. Martinez called his friend Orlando Soto who said he might be able to get the marijuana. A few days later, Martinez met Wamsley and Elmore at a McDonald's restaurant. Wamsley and Elmore arrived in a white car and followed Martinez to Soto's house. Elmore stayed outside in the car while Wamsley and Martinez went inside Soto's house. After Soto called the seller, Soto, Wamsley, and Martinez drank beer while waiting almost two hours for the seller to get to the house. Martinez testified that Soto's brother, cousin, and uncle were also in the house.

Martinez testified that Rafael Calixto and Rafael Duarte arrived at Soto's house and carried in two supermarket bags. Martinez did not look in the bags but assumed they contained the marijuana. After Calixto and Wamsley discussed the weight and price of the marijuana, Wamsley called Elmore and told him to bring in the money. Just as Martinez saw Elmore enter the house, Wamsley pulled out a gun, put it to Martinez's head,

−3−

and pushed him to the ground. Wamsley put his hand in Martinez's pockets and pulled out his money, his pocket knife, and his cell phone. Martinez tried to stand up but Wamsley kicked him in the ribs. Then Martinez heard a shot from a "big gun," not a pistol, and heard people running. When he got up, Martinez saw that Rafael Duarte had been shot. Martinez went outside the house, where Soto's brother was calling 911. Soto's brother was having trouble speaking English so Martinez took over the call. In the 911 call, Martinez told police that three Black males were involved.

After making the 911 call, Martinez and Soto agreed to tell the police that they were robbed but to say nothing about the drugs. Martinez kicked the door to make it look like a robbery. When the police arrived, Martinez told them that three Black males kicked in the door to gain entrance to the house and a man was shot during the robbery. Martinez did not mention the marijuana transaction. Martinez finally admitted that he initially lied to the police about what happened. The next day, Martinez went back to the police station and told the police about the drug transaction and what transpired. He told the police that he and Wamsley had exchanged several phone calls on the day of the drug deal. He could not remember Wamsley's cell phone number but he gave the police information about his own cell phone. Martinez told the police that he only saw two Black males. A few days later, the police showed Martinez lineups containing photographs of Wamsley and Elmore.

Rafael Calixto Cardenas testified that Rafael Duarte worked for him. Calixto drove Duarte to and from work. On January 10, 2009, Calixto received a call from Soto, asking if Calixto could get some marijuana for a friend. Calixto told Duarte that he was going to a house to pick up some money, and Duarte insisted on going with him. Calixto

did not tell Duarte that he was actually going to deliver marijuana. Calixto drove to Soto's house and went inside. Duarte followed Calixto into Soto's house because he wanted to use the restroom. Calixto went into the kitchen with Soto, Martinez, and a dark-skinned Hispanic-looking man Calixto had never met before [Wamsley]. About five minutes later, a young Black man came into the house. He was followed by a third man who came in and began shooting. Calixto later identified appellant as the third man. Appellant had a short, black shotgun, and yelled for everyone to get down on the floor. Calixto saw fire come out of the shotgun. Duarte was sitting on the sofa when he was shot, and Calixto saw him fall. After Duarte was shot, Calixto ran out of the house. He testified he wanted to use his truck to block the cars of the men who shot his friend. However, Calixto could not find his keys so he hid until the police arrived. Calixto talked to the police but admitted he did not initially tell the truth. He did not tell the police about the marijuana. He also did not remember first telling the police that he was not even in the house at the time of the shooting; he said there was a misunderstanding because he said he ran out of the house after the shooting. Calixto went to Duarte's house and told his wife they had been robbed and Duarte had been shot. Calixto then went to Mexico.

Detective Leopoldo Gonzalez testified that he is the homicide detective who was assigned to this case. He went to the scene, talked to the officer at the scene, and learned there were four witnesses. He interviewed the witnesses briefly at the scene and then had them taken to the police station to be interviewed further. He personally talked to Soto, while other officers talked to Calixto and Martinez. There were discrepancies in the witness statements. Later that week, Martinez came back to the police station and told the

police that on the day of the offense, he had several phone conversations with one of the suspects ["P"]. Martinez told Detective Gonzalez that his cell phone number was 214-442-3971. Martinez also pointed Detective Gonzalez to a phone number, 214-723-3765, that he thought belonged to "P." Once Wamsley's fingerprints were found on one of the beer bottles at the scene, he was identified as a suspect. Martinez then identified Wamsley as the man known as "P" through a photographic lineup.

Detective Gonzalez asked for a court order for Wamsley's telephone records and text messages from phone number 214-723-3765. With the help of a list of cell tower locations from MetroPCS, Detective Gonzalez was able to determine the location from which phone calls were made. Detective Gonzalez then used Wamsley's telephone records to see who he was calling and texting at the time of the offense. The records showed that Wamsley called Elmore at 469-765-2526 during the offense. Detective Gonzalez testified that Wamsley's phone records also showed calls to another number, 214-866-9559, during the offense. According to Detective Gonzalez, during the time of the offense, calls between these three phone numbers were hitting off similar cell phone towers.

Elmore was identified by the witnesses through a photographic lineup and arrested. When Detective Gonzalez interviewed Elmore, Elmore told him he should investigate the 214-866-9559 phone number. Subscriber information for this number listed the owner as GPHAT. Using telephone records for 214-866-9559, Detective Gonzalez called several numbers that had been called from that number. A woman answering one of Detective Gonzalez's calls told him that the 214-866-9559 number

belonged to appellant. Detective Gonzalez did not initially consider appellant a suspect because Martinez told the police he only saw two suspects. Several months later, Detective Gonzalez obtained a phone number for Calixto in Mexico. Calixto told Detective Gonzalez there was a third person involved. After Calixto was interviewed by investigators from the district attorney's office, Detective Gonzalez filed a case against appellant. Appellant later told Detective Gonzalez that one of his nicknames was PHAT, and 214-866-9559 was one of his personal contact numbers.

Natoya Bell testified that on January 10, 2009, she was living with her boyfriend, Derric Elmore. She testified that she knew "P" [Wamsley], and had met appellant, nicknamed "Lil' Cuz," through Wamsley about two weeks before the shooting. On the day of the shooting, Wamsley had been at their apartment all day. When she got home from work, Elmore told her he was going to take Wamsley home and they left in her car. Elmore then sent her a text saying that he and Wamsley were going to buy some marijuana with counterfeit money. Elmore called and sent text messages to her, telling her that he would be late. She said Elmore used the phone of "Lil' Cuz" for some of the text messages and calls because Elmore's phone needed to be charged. When Elmore got back to the apartment, Wamsley and appellant were with him and they were nervous and "all out of control." Wamsley was mad and appellant was defending himself. Bell testified that Elmore told her that "Lil' Cuz" had shot one of the men they were robbing. Wamsley kept saying to appellant, "You didn't have to shoot him." Appellant told them that Duarte was going toward Wamsley so he had to shoot him. Bell testified that Wamsley gave Elmore and appellant some of the marijuana. After appellant left, Bell and Elmore drove

Wamsley to his mother's house. Wamsley went into the house and returned with a grocery bag full of marijuana, compressed into bricks. Bell and Elmore drove Wamsley up the street to meet the person to whom Wamsley sold the marijuana, then drove Wamsley back home to his mother's house.

After Elmore was arrested, he called Bell from jail. He told her to talk to Detective Gonzalez and tell him that Elmore did not kill anyone. Bell then contacted Detective Gonzalez and told him everything she knew. Bell's phone calls to Elmore in jail were taped and admitted into evidence.

## B. Accomplice Testimony

The jury heard the testimony of accomplice Phaylon Wamsley. Wamsley testified that he had an agreement with the State to testify and tell the truth in exchange for a reduced charge of aggravated robbery and a reduced sentence of ten years. Wamsley identified appellant and said he called him "Lil' Cuz." Wamsley testified that he and Elmore met a "Spanish dude" named Martinez in a gun store and Martinez expressed interest in purchasing a .38 from Wamsley. After seeing the gun, Martinez did not want to buy it. But Martinez offered to sell Wamsley some marijuana. Approximately two weeks later, Wamsley and Elmore met Martinez in a McDonald's parking lot to do a drug deal. When Martinez arrived at the McDonald's, Wamsley got into his vehicle to discuss the transaction. Martinez told Wamsley that the price would be $475 per pound, instead of the $400 per pound that Wamsley was expecting. Wamsley testified that at first, it was just going to be a drug deal, but when he learned the price had increased, he and Elmore decided to rob the drug dealers and take the marijuana. Wamsley later testified that he put

-8-

the robbery plan together when he was at Bell's apartment—even before he knew about the price increase. Wamsley talked to appellant, asked him if he wanted to make some money, and told him the plan. They planned to use guns because, as Wamsley testified, "you can't strong arm no drug deal." Wamsley testified that he was armed with a gun.

Martinez did not have the marijuana with him so Wamsley and Elmore followed Martinez to the house where the drug transaction was to take place. When they arrived at the house, Wamsley told Elmore stay in the car and wait while he went into the house with Martinez. He also told Elmore to call appellant and give him directions. Wamsley testified that Elmore and appellant were supposed to be his backup.

Wamsley testified he was in the house for about 45 minutes drinking beer and talking before the men arrived with the marijuana. They weighed the marijuana and the seller asked for the money. Wamsley walked to the porch and signaled Elmore to come in the house. Wamsley testified that Elmore walked in with a twelve-gauge shotgun in his hands so Wamsley pulled out his gun. Appellant followed Elmore into the house, carrying a small, short-barrel twelve-gauge shotgun. Wamsley told Martinez to lie on the ground and pull out his pockets, and Wamsley took Martinez's phone. Wamsley testified that appellant fired a shot. Upon hearing the shot, Wamsley grabbed the drugs and ran out of the house. As he ran, Wamsley saw Duarte, who had been shot, fall down on the couch. Wamsley later testified he did not see appellant shoot Duarte, but appellant told him he did the shooting.

When Wamsley and Elmore got back to Bell's apartment, appellant was already there. Wamsley testified that he was "messed up" because he did not mean for anyone to

get hurt and the robbery was not "supposed to go down like that." Wamsley had expected it to be an easy robbery because "drug dealers don't call the police." Wamsley yelled at appellant and asked him why he shot someone. Appellant told Wamsley he was defending him because "the dude" was moving toward Wamsley. Wamsley, Elmore, and appellant each took some of the marijuana. Wamsley was arrested about a week and a half later.

## C.  Cell Phone Records

The trial court admitted into evidence detailed call records for cell phones belonging to Wamsley, Elmore, and appellant. Using both the information in these records and the cell towers with which each cell phone "communicated," Jeff Savage, an investigator with the Dallas District Attorney's office, determined the approximate locations of these three individuals when they used their cell phones on the day of the offense. Investigator Savage testified that he researched and summarized cell phone and text message records for the three phone numbers. He also prepared maps showing cell phone locations at given times during the day of the offense. Savage mapped the location of Wamsley's and Elmore's cell phones in the vicinity of Bell's apartment until 5:48 p.m. Wamsley's and Elmore's cell phone records showed movement, and from 6:56 p.m. until 7:25 p.m., they were in the vicinity of the McDonald's located at 175 and Buckner. Savage testified that at 6:54 p.m., appellant's cell phone was at the same location. Savage testified that during this period of time, the phone records reflect that Elmore and appellant switched phones. Telephone records indicate a call and text from Elmore's phone to appellant's girlfriend, and calls and texts from appellant's phone to Elmore's girlfriend. Savage further testified

that from 7:36 p.m. to 9:11 p.m., all three cell phones moved to the scene of the murder.

The 911 call reporting the shooting was made around 9:12 p.m. Savage then mapped the line of travel for Wamsley, Elmore, and appellant, as they drove north to the vicinity of 9600 Forest Lane and Natoya Bell's apartment. Savage was able to determine that Elmore traveled west from Soto's house, and then north on I-75, arriving at Bell's apartment at 9:53 p.m. Savage testified that based on Wamsley's telephone records, he appeared to be in the same car as Elmore. Savage also mapped appellant traveling north on LBJ Freeway, arriving at Bell's apartment at 9:34 p.m.

## II. DISCUSSION

Appellant raises five issues on appeal. He complains the trial court erred in denying his request for a jury instruction on the lesser included offense of murder. He contends the trial court abused its discretion by admitting Wamsley's cell phone records into evidence. He challenges the in-court identification by witness Calixto, and the testimony of accomplice Wamsley. Finally, appellant challenges the sufficiency of the evidence to support his conviction for capital murder. We begin our analysis with appellant's fifth issue.

### A. Sufficiency Of The Evidence

Appellant argues the evidence is legally insufficient to support his conviction for capital murder. We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of

the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Adames*, 353 S.W.3d at 860. This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see Adames*, 353 S.W.3d at 860. The jury is the sole judge of the witnesses' credibility and the weight to be given their testimony and therefore, is free to accept or reject any or all evidence presented by either side. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *see also Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). We defer to the jury's determinations of witness credibility and weight of the evidence, and may not substitute our judgment for that of the fact finder. *See Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000).

In evaluating a sufficiency claim, we consider all evidence presented to the jury, regardless of whether it was properly or improperly admitted. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Williams v. State*, 2012 WL 5350974, at *3 (Tex. App.—Dallas Oct. 31, 2012, no pet.) (mem. op., not designated for publication). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

A person commits the offense of capital murder if the person intentionally or knowingly commits murder as defined under Section 19.02(b)(1) in the course of committing or attempting to commit burglary or robbery. TEX. PENAL CODE §19.03(a)(2)

(West Supp. 2012). In capital murder offenses committed during the course of a robbery, the legal sufficiency standard applies to both the charged and underlying offenses. *Russo v. State*, 228 S.W.3d 779, 792 (Tex. App.—Austin 2007, pet. ref'd). To establish the murder portion of the offense, the State must prove beyond a reasonable doubt that the defendant intentionally or knowingly caused the death of an individual as charged in the indictment. *Id.* For murder to qualify as capital murder in the course of a robbery, the defendant's intent to rob must be formed before or at the time of the murder. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). Proof of robbery "committed as an afterthought and unrelated to a murder" is not sufficient evidence of capital murder. *Alvarado v. State*, 912 S.W.2d 199, 207 (Tex. Crim. App. 1995); *Nelson v. State*, 848 S.W.2d 126, 131 (Tex. Crim. App. 1992).

The Court of Criminal Appeals has referred to sections 7.01 and 7.02 of the Texas Penal Code as the "law of parties." *E.g., Montoya v. State*, 810 S.W.2d 160, 165 (Tex. Crim. App. 1989). When a jury is charged on law of parties, a person may be convicted as a party to an offense, if the offense is committed by his own conduct or by the conduct of another for which he is criminally responsible. TEX. PEN. CODE § 7.01(a) (West 2011).

The record shows that Wamsley and Elmore conspired to commit a robbery during their drug transaction with Martinez, even before they met Martinez in the McDonald's parking lot. Wamsley contacted appellant to see if he wanted to make some money, and told Elmore to keep appellant informed of changes in their plan to rob the drug dealers. As back-up for Wamsley, appellant and Elmore were both armed with shotguns. Wamsley was armed with a handgun. Wamsley was already in the process of robbing

–13–

Martinez when appellant walked into the house and shot Duarte. After the shooting, Wamsley picked up the marijuana and ran outside. The record contains evidence that Wamsley, Elmore, and appellant divided the stolen marijuana between themselves.

Calixto testified that appellant was the person who shot Duarte. Bell testified that Elmore told her appellant shot someone during the drug transaction. She also testified that when Wamsley asked appellant why he fired his shotgun, appellant said he was trying to protect Wamsley from Duarte.

The jury heard all the testimony. It was the role of the jury to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 899. Reviewing all the evidence in the light most favorable to the jury's verdict, we conclude a jury could reasonably find from the evidence presented that the essential elements of capital murder were established beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *Adames*, 353 S.W.3d at 860. We resolve appellant's fifth issue against him.

**B.  Lesser Included Offense**

In his first issue, appellant argues the trial court erroneously denied his request for a jury charge on the lesser-included offense of murder because there was no evidence of appellant's intent to rob before or at the time of the murder. We use a two-step test to determine whether appellant was entitled to an instruction on a lesser-included offense. *Cavazos v. State*, 382 S.W.3d 377, 382 (Tex. Crim. App. 2012); *Sweed v. State,* 351 S.W.3d 63, 67 (Tex. Crim. App. 2011); *Guzman v. State*, 188 S.W.3d 185, 188 (Tex. Crim. App. 2006). We first determine whether murder is a lesser-included offense of capital

murder by comparing the statutory elements of the greater offense and any descriptive averments in the indictment with the statutory elements of the potential lesser-included offense. *Sweed*, 351 S.W.3d at 68; *Hall v. State*, 225 S.W.3d 524, 535–36 (Tex. Crim. App. 2007). This inquiry is a question of law. *Hall*, 225 S.W.3d at 535. If this threshold is met, the second step then requires that we determine if there is some evidence in the record that would have permitted the jury to rationally find that if the defendant was guilty, he was guilty only of the lesser-included offense of murder. *Id*. at 536; *Guzman*, 188 S.W.3d at 188–89; *Rousseau v. State*, 855 S.W.2d 666, 673 (Tex. Crim. App. 1993). Anything more than a scintilla of evidence may be sufficient to entitle a defendant to a lesser charge, but the evidence must establish the lesser-included offense as a valid, rational alternative to the charged offense. *Hall*, 225 S.W.3d at 536; *Forest v. State*, 989 S.W.2d 365, 367 (Tex. Crim. App. 1999). Although the threshold showing required for an instruction on a lesser-included offense is low, it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense; there must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before a lesser-included offense instruction is warranted. *Bignall v. State*, 887 S.W.2d 21, 24 (Tex. Crim. App. 1994).

Here, the parties do not dispute or even address the first step of the test to determine whether appellant was entitled to an instruction on a lesser-included offense. Therefore, as this was not a stated ground for review by this Court, we will assume without deciding that the first step of the analysis is satisfied (i.e., that the lesser-included offense of murder is included within the proof necessary to establish the charged offense of capital murder).

*See Sweed*, 351 S.W.3d at 68.

Appellant was charged with capital felony murder, which requires the State to prove appellant intentionally caused Duarte's death in the course of committing robbery. *See* TEX. PENAL CODE ANN. § 19.03(a)(2). Appellant argues there is no direct evidence to prove that he knew there was going to be a robbery at the drug house. He contends that Bell's testimony is evidence that his intention in shooting Duarte was to protect co-defendant Wamsley from being shot, and not to facilitate a robbery. The State responds that the circumstantial evidence proves appellant's intent to participate in the robbery.

Intent may be inferred from the acts, words, and conduct of a defendant. *Cooper v. State*, 67 S.W.3d 221, 225 (Tex. Crim. App. 2002); *McGee v. State*, 774 S.W.2d 229, 234 (Tex. Crim. App. 1989); *Fierro v. State*, 706 S.W.2d 310, 313 (Tex. Crim. App. 1986). Intent is a question of fact to be determined by the trier of fact from all the facts and circumstances in evidence. *Hemphill v. State*, 505 S.W.2d 560, 562 (Tex. Crim. App. 1974). Elmore did not testify, and thus did not address the issue of what he told appellant about a robbery. However, Wamsley testified that Elmore talked to appellant about changing their plan from a drug deal to a robbery. Calixto testified that when appellant followed Elmore into the house, both were armed with shotguns. Martinez testified that Wamsley was in the process of robbing him at gunpoint when appellant fired the shot that killed Duarte. Even if appellant did not know that Wamsley and Elmore had planned to rob the drug dealers, the evidence indicates that appellant knew a robbery was occurring when he shot Duarte. If there is evidence from which the jury could rationally conclude

–16–

beyond a reasonable doubt that appellant or his co-defendants formed the intent to obtain or maintain control of the property either before or during the commission of the murder, the State has proven that the murder occurred in the course of robbery. *Conner*, 67 S.W.3d at 197; *Robertson v. State*, 871 S.W.2d 701, 705 (Tex. Crim. App. 1993); *Delacruz v. State*, 278 S.W.3d 483, 491 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd).

We cannot conclude the evidence of the aggravating element of robbery is so weak that a rational jury might interpret it in such a way as to give it no probative value. *Robertson*, 871 S.W.2d at 706. In addition, appellant failed to demonstrate there is evidence from which a jury rationally could find that, if appellant is guilty, he is guilty only of the lesser offense. *Guzman*, 188 S.W.3d at 189. Thus, we cannot conclude the evidence establishes the lesser-included offense of murder as a valid, rational alternative to the charged offense. *See Hall*, 225 S.W.3d at 536; *Delacruz*, 278 S.W.3d at 491. Accordingly, we resolve appellant's first issue against him.

## C. Cell Phone Records

In his second issue, appellant contends the trial court erred by admitting cell phone records into evidence. Appellant complains not only of the admission of his own cell phone records, but also of the admission of the phone records of his co-defendants, Wamsley and Elmore. Appellant asserts the petitions for court orders to obtain such records did not set out "specific and articulable facts" upon which a court may be allowed to issue orders to disclose phone records, in violation of 18 U.S.C. § 2703, article 38.23 of the Texas Code of Criminal Procedure, and the Fourth Amendment to the United States Constitution. We review a trial court's decision to admit or exclude evidence for an abuse

–17–

of discretion. *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). As long as the trial court's ruling is "within the zone of reasonable disagreement," we will not disturb the ruling. *Id.* (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)).

A suppression hearing was held outside the presence of the jury. Appellant's counsel advised the trial court that the issue of admissibility of phone records had been argued during the prior trial of co-defendant Elmore. Appellant's trial counsel stated "the only argument we would proffer is the same argument that was made by Russell Wilson at the prior hearing [Elmore's trial], and I can recite that argument to you or the Judge can take judicial notice of the argument that was made a part of the transcript." The trial court took judicial notice of the argument made during Elmore's trial and admitted State's Exhibit B, a copy of the Elmore trial transcript showing the argument and predicate laid with respect to the phone records of Wamsley, Elmore, and appellant. During the Elmore trial, Detective Gonzalez testified that he prepared a petition asking the trial court to order the telephone company to produce telephone records [subscriber information, incoming calls, outgoing calls, and text messages] for phone number 214-723-3765, a number for Wamsley. Once Detective Gonzalez obtained the telephone company's records for 214-723-3765, he became aware of two additional phone numbers that were connected to the crime: 469-765-2526, a number for Elmore, and 214-866-9559, a number for appellant. He then prepared petitions asking the court to order the telephone company to produce telephone records for 469-765-2526 and 214-866-9559. Detective Gonzalez testified that the phone records obtained were a significant part of his investigation.

Elmore's trial counsel argued that the phone records should be suppressed because the petitions did not set out "specific and articulable facts" upon which a court may be allowed to issue an order to disclose phone records, in compliance with 18 U.S.C. § 2703. Elmore's counsel also argued, "[a]s it relates to Mr. Elmore and his specific case" disclosure of Elmore's phone records violated his Fourth Amendment privacy rights. In response, the State argued that the facts set forth in the petitions were sufficient because Detective Gonzalez tracked the statutory language. The State also argued it would have been entitled to issue a subpoena duces tecum to get the same information because there was no privacy interest in the information. The trial court sustained the defense objection regarding the content of the text messages but otherwise overruled the objection.

During appellant's suppression hearing, the trial court admitted Defendant's Exhibits 1, 2, 3, 4, and 5, the petitions for court orders to obtain telephone records that were filed by Detective Gonzalez. The trial court reviewed Detective Gonzalez's testimony and the arguments made at Elmore's trial. The court then overruled appellant's objections as to the phone records that were the subject of the petitions and orders, and admitted those exhibits into evidence.

Appellant now complains that the State should have applied for search warrants, instead of filing petitions for court orders. To preserve a complaint for appellate review, a party generally must present it to the trial court by timely request, motion, or objection, stating the specific grounds, and obtain a ruling. TEX. R. APP. P. 33.1(a); *see Shaw v. Cnty. of Dallas*, 251 S.W.3d 165, 174 (Tex. App.—Dallas 2008, pet. denied). Because appellant did not make this complaint to the trial court, this complaint is not preserved for

appeal. *Id.* Appellant also complains that the petitions for court orders did not set out specific, articulable facts to show why the phone numbers at issue were related to the case, and thus the exclusionary rules set forth in 18 U.S.C. § 2703 and article 38.23 of the Texas Code of Criminal Procedure were violated. A governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a customer of such service only when the governmental entity obtains a warrant or "obtains a court order for such disclosure under subsection (d) of this section." 18 U.S.C.A. § 2703(c)(1)(A) & (B) (West Supp. 2012). The statute further provides:

> [a] court order for disclosure under subsection (b) or (c) may be issued by any court that is a court of competent jurisdiction and shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation.

18 U.S.C.A. § 2703(d). Article 38.23 of the Texas Code of Criminal Procedure states:

> [n]o evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (West 2005). Here, the petitions requesting court orders for phone records stated that petitioner had reason to believe that the records and information sought were relevant in a current, on-going police investigation of a capital murder that occurred on January 10, 2009, and was reported on Dallas Police Department offense number 9747-W. Thus, appellant's argument that the State obtained phone records in violation of 18 U.S.C. § 2703 and section 38.23 of the Texas Code of

–20–

Criminal Procedure is without merit. *See Uresti v. State*, 98 S.W.3d 321, 328 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (statements that the telephone numbers are being utilized and employed for the purpose of furthering criminal activity were specific and articulable facts sufficient to meet the requirement of 18 U.S.C. § 2703(d)).

Finally, appellant argues that admitting the phone records into evidence violated his Fourth Amendment rights of protection from unlawful search and seizure of data from cell phone providers. The State argues that appellant has no privacy interest in the telephone records of Wamsley and Elmore and therefore, has no standing to complain about their admission. *See Wilson v. State*, 692 S.W.2d 661, 668–69 (Tex. Crim. App. 1984) (op. on reh'g) (State not barred from raising issue of defendant's standing for the first time on appeal). Appellant cites no authority showing he had a privacy interest in the phone company's records for Wamsley and Elmore and therefore, he has no standing to complain about their acquisition. *Stephens v. State*, 834 S.W.2d 94, 96 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd) (defendant had no standing to complain of, and no reasonable expectation of privacy in, the phone company's records). With respect to appellant's Fourth Amendment privacy interest in his own phone records, appellant did not raise this complaint at trial. *See* TEX. R. APP. P. 33.1(a); *see also Shaw*, 251 S.W.3d at 174. Because appellant did not make this complaint to the trial court, it is not preserved for appeal. *Shaw*, 251 S.W.3d at 174. We conclude the trial court did not abuse its discretion in admitting the cell phone records into evidence. Appellant's second issue is overruled.

## D. In-Court Identification

In his third issue, appellant contends the trial court erred when it allowed the in-court identification of appellant by Calixto because the in-court identification was tainted by improper pretrial identification procedures. Specifically, appellant complains that when Investigator Bedolla administered the photographic lineup to Calixto, Investigator Savage was present even though he knew which photograph was appellant's photograph. Appellant argues that Investigator Savage's presence in the room was impermissibly suggestive and created a substantial likelihood of misidentification.

To establish error by the trial court in admitting the in-court identification by Calixto, appellant first had to prove by clear and convincing evidence and based on the totality of the circumstances that the photographic array procedure used was impermissibly suggestive. *See Barley v. State*, 906 S.W.2d 27, 33–34 (Tex. Crim. App. 1995). A pretrial procedure may be suggestive, but that does not necessarily mean it is impermissibly so. *Id.* at 34. Suggestiveness may be implicated by the manner a pretrial identification is conducted, as in suggesting a suspect is included in the array, or by the content of the photo array itself, such as when the suspect is the only individual who closely resembles the pre-procedure description. *See id.* at 33.

Juan Bedolla, an investigator with the Dallas County District Attorney's Office, testified that he and Investigator Savage traveled to Laredo, Texas, on March 6, 2010, to interview Rafael Calixto. During the interview, Investigator Bedolla administered three photographic lineups. Bedolla testified that the photographic lineups were prepared by a Dallas police detective, and Bedolla used the Dallas Police Department's photographic

lineup procedures as a guideline. Bedolla showed Calixto the photographs one by one, asked Calixto if he recognized the person, and continued to show him each photograph in the lineup. Appellant's photograph was the second photograph in one of the lineups. When Calixto viewed the second photograph, he stopped, looked at the photograph, and said he thought that was the guy. Bedolla admonished Calixto, telling him he had to be one hundred percent sure. Calixto said he was not sure and asked to see the remaining photos. Calixto looked at the remainder of the photographs in the lineup and said he did not recognize the remaining photographs. Calixto asked to see the photographic lineup again, selected photograph number two, and said that he was not one hundred percent sure but there was something about this face that he recognized. Calixto told Bedolla it was a face he could not forget and he recognized the person in the photograph as being at the scene of the offense. Bedolla testified that when asked where he saw this person at the scene of the offense, Calixto said this was the person who came in and shot.

At the time he administered the photographic lineup, Investigator Bedolla did not know which of the photos was appellant's. Investigator Savage, who was also in the room at the time the photographic lineup was administered, did know which photograph was a photograph of appellant. The record contains no testimony or other evidence that Investigator Savage influenced Calixto's identification of appellant in any way. Appellant provides no argument or authority to support his assertion that the mere presence of Investigator Savage is impermissibly suggestive, other than to complain that the investigators failed to follow the Dallas Police Department's procedures for a "double-blind" lineup.

A photographic lineup will be set aside only if it is so impermissibly suggestive that it gives rise to a substantial likelihood of irreparable misidentification. *Simmons v. United States*, 390 U.S. 377, 384 (1968); *Taylor v. State*, 474 S.W.2d 207, 210 (Tex. Crim. App. 1971). Such an analysis requires an examination of the totality of the circumstances surrounding the particular case and a determination of the reliability of the identification. *Conner,* 67 S.W.3d at 200. Based on our review of the record, appellant has failed to prove by clear and convincing evidence and based on the totality of the circumstances that the photographic array procedure used was impermissibly suggestive. We conclude the trial court did not abuse its discretion in finding that the photographic array procedure was not impermissibly suggestive and did not create a substantial likelihood of misidentification. The trial court did not err in allowing the in-court identification of appellant by Calixto. We overrule appellant's third issue.

**E. Accomplice Witness Testimony**

In his fourth issue, appellant argues the trial court erred by allowing the accomplice witness testimony of Wamsley into evidence. The State responds that Wamsley's testimony was properly allowed because it was corroborated by other evidence. An accomplice is a person who participates with a defendant before, during, or after the commission of the crime and acts with the requisite culpable mental state. *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). An individual is an accomplice as a matter of law if he could be prosecuted for the same offense with which the defendant is charged or a lesser-included offense of that charge. *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). The parties do not dispute that Wamsley was an accomplice as a

matter of law.

The accomplice-witness rule provides that a conviction cannot stand on accomplice testimony unless it is corroborated by other evidence tending to connect the defendant with the offense. TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). To corroborate accomplice testimony, "the reviewing court eliminates all of the accomplice testimony from consideration and then examines the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime." *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007) (citing *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)). The corroborating evidence need not be sufficient by itself to establish guilt; there simply needs to be "other" evidence "tending to connect" the defendant to the offense. *Id*. In this case, testimony from Martinez established that capital murder occurred. Martinez was being robbed by Wamsley when a man, identified by other witnesses as appellant, entered the house and fired the shot that killed Duarte. Calixto identified appellant as the man who fired the shot that killed Duarte. Bell testified that Elmore told her that appellant shot someone. Bell witnessed Wamsley yelling at appellant for shooting someone during the robbery. Bell testified that Wamsley gave appellant the marijuana that had been taken during the robbery. The record also contains the recorded jail phone call between Elmore and Bell, in which Bell discussed what Elmore told her about the offense, including appellant shooting Duarte while Wamsley was stealing the marijuana.

We conclude the non-accomplice evidence tends to connect appellant with the commission of the offense alleged in the indictment. *See Castillo*, 221 S.W.3d at 691

(citing *McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997)).   Appellant's fourth issue is overruled.

### III.   CONCLUSION

Having overruled all of appellant's issues, we affirm the trial court's judgment.


   /Martin Richter/
MARTIN RICHTER
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

110259F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MONICE MCKEE ANDERSON, Appellant

No. 05-11-00259-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 1, Dallas County, Texas
Trial Court Cause No. F10-51906-H.
Opinion delivered by Justice Richter.
Justice Murphy participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 30th day of April, 2013.

/Martin Richter/

MARTIN RICHTER
JUSTICE, ASSIGNED